UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOLIET AVIONICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19 cv 8507 |
| | ) |
| LUMANAIR, INC., a Delaware | ) |
| corporation and CITY OF AURORA, | ) |
| a municipal corporation, | ) |
| | ) |
| Defendants. | ) |

<u>First Amended Complaint</u>

NOW COMES JOLIET AVIONICS, INC., an Illinois corporation, by and through

attorneys, SmithAmundsen LLC, and as its First Amended Complaint against Defendant,

City of Aurora, a municipal corporation, states as follows:

<u>Jurisdiction</u>

Defendant, City of Aurora, removed this cause from the Circuit Court of the

Sixteenth Judicial Circuit, Kane County, Illinois based on Defendant's assertion the cause of

action filed by Plaintiff against Defendant, City of Aurora, in its Complaint includes a

civil action of which this Court has original federal question jurisdiction and, at that

time, supplemental jurisdiction under the provisions of 28 U.S.C. §§ 1331, 1367, and

1343, and is further an action which may be removed to this Court by Defendant

pursuant to the provisions of 28 U.S.C. §§ 1441 and 1443, in that Plaintiff's Complaint

includes an action brought for an alleged violation of Plaintiff's constitutional rights

under 42 U.S.C. § 1983.

1

Count I

Unlawful Discrimination – City of Aurora - §1983

*The Parties*

1.        Defendant, City of Aurora, ("Aurora" or "the City") is the owner and sponsor of the Aurora Municipal Airport (the "Airport"), which is a federally funded airport, located in Sugar Grove, Illinois. The City, through its City Council and Mayor, is authorized to make decisions in regard to the terms of leases granted to tenants at the Airport.

2.        Plaintiff, Joliet Avionics, Inc. ("JA" or "Plaintiff") is an authorized and licensed Fixed Base Operator (referred to as a "FBO") doing business at the Aurora Airport pursuant to a lease with the owner and sponsor of the airport, the City of Aurora.

3.        Plaintiff was a party to and entered into a certain lease with City of Aurora on or about December 12, 2006 (the "2006 Lease") whereby the City leased certain real property at the Aurora Municipal Airport to Plaintiff on which Plaintiff would build a structure or structures consisting of hangars and office space and offer various aeronautical and flight related services to the public. Such a business is known as a "Fixed Base Operator" ("FBO"). The 2006 Lease is attached hereto as **Exhibit No. 1**.

4.        Aurora was unable to meet its written obligations under the 2006 Lease resulting in the termination of the 2006 Lease. However, by the time Aurora had notified Plaintiff it could not meet its written obligations under the 2006 Lease, Plaintiff had expended approximately $250,000 on pre-construction costs, of which funds Plaintiff lost the use, until an accommodation was made in 2015.  In addition Plaintiff's management spent many hundreds of man-hours designing the new facility.

5.        Aurora then entered into a new lease with Plaintiff of other real property located at the Aurora Municipal Airport, on or about November 27, 2007 (the "2007 Lease"). A copy of the

2007 Lease is attached as **Exhibit No. 2**. Under the 2007 Lease Plaintiff would operate as an FBO at the Aurora Airport, and use hangars owned by the City, known as "Hangars 5, 6 and 7" and Plaintiff would purchase a large hangar, known as the "BP Hangar" and immediately convey the BP Hangar to the City.

6. Under the terms of the 2007 Lease, Plaintiff would be responsible for payment of all amounts of principal and interest required to make improvements and renovations of the City owned Hangars 5, 6 and 7 and to purchase the BP Hangar, and to install above-ground fuel tanks, requiring an initial expense of approximately $10,000,000, in conformance with certain Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport (the "Minimum Standards"), established by Aurora as required by the Federal Aviation Administration, ("FAA"). The payments of principal and interest required of Plaintiff under the terms of its lease (known as "Rent Equivalents") averaged approximately $500,000 per year.

7. Lumanair Inc., a Delaware corporation, ("Lumanair") was at relevant times also a FBO operating at the Aurora Airport, similarly situated with Plaintiff, offering similar or identical services to the public. Lumanair was also subject to land leases with Aurora. Each of those leases expired on February 28, 2019.

8. In addition, like Lumanair, Plaintiff was required to pay "Additional Rent" in the amount of 1.5% of gross receipts derived from operations on the leased premises and fuel flowage charge in the amount of $0.05 per gallon of fuel sold.

9. Lumanair continued to operate its business at the Airport from March 1, 2019 to July 31, 2020 without a lease, contrary to the terms of the Minimum Standards.

10.     Despite numerous claims of default by the City on the part of Lumanair, on August 1, 2020, the City entered into a new lease with Lumanair allowing Lumanair to operate its business at the Airport and to remain in possession of the hangars and office buildings occupied by Lumanair, contrary to the terms of Lumanair's expired lease, and at the expense of taxpayers, paying no rent for the occupancy of the hangars and buildings, other than minimal ground rent and "additional rent" based on gross receipts and a $0.05 fuel flowage charge on gallons of fuel sold by Lumanair.

11.     Plaintiff has been required by the terms of its lease to pay rent equivalents to the City of Aurora averaging approximately $500,000 per year.

12.     On or about July 27, 2021, Aurora passed City of Aurora Resolution No. R21-205 whereby Aurora allowed Lumanair to exercise its right under its lease to assign its lease to Carver Aero, LLC, an Iowa limited liability company, ("Carver") which subsequently took over possession of the hangars and office buildings previously occupied by Lumanair and continued to operate the FBO and business previously operated by Lumanair at the Aurora Municipal Airport.

13.     Carver continues to operate a FBO at the Aurora Airport which is similarly situated to the FBO operated by Plaintiff.

14.     In multiple ways the City has, over a period of years, established a policy, custom and practice or a *de facto* policy, custom and practice of discriminating against Plaintiff by treating similarly situated Lumanair and similarly situated Carver differently and far more favorably than similarly situated Plaintiff, including without limitation the ways expressed herein, all without a good faith rational basis for the difference in treatment, and all of which have resulted in economic damages to Plaintiff.

15.     As more fully detailed hereinbelow, the terms of Aurora's leases with Lumanair required Lumanair and its successor, Carver, to pay approximately $0.39 per sq. ft of occupied space at the Airport from 1982 to January 1, 2022. Aurora's lease with Plaintiff required Plaintiff to pay ten times as much, approximately $3.94 per sq. ft. for the space it occupied at the Airport during the same period of time.

16.     Between December 2008 and January 1, 2022, the discrepancy in cost of occupancy under the terms of Aurora's leases with Plaintiff and Plaintiff's comparators, Lumanair and Carver, resulted in Plaintiff paying approximately $6,162,421 more than its comparators for the occupancy of its space at the Aurora Airport

17.     Between January 1, 2022 and January 1, 2032, the discrepancy in the cost of occupancy under the terms of Aurora's lease with Plaintiff and Aurora's lease with Carver, resulting from the disparate terms of their respective leases, will result in Plaintiff paying $3,216,854 more in occupancy costs than its comparator, Carver.

18.     The difference in occupancy costs does not include the cost of financing the difference in the amount charged by Aurora for basic occupancy of the space occupied by Plaintiff at the Airport and the space occupied by Plaintiff's comparators, Lumanair and Carver, at the Airport, which costs exceed $3,191,811.

19.     Plaintiff occupies approximately 131,120 sq. ft. under its lease with Aurora at the Airport. The space previously occupied by Lumanair and now occupied by Carver at the Airport is approximately 85,600 sq. ft. Thus, the space occupied by Lumanair, now Carver, is approximately 35% less space than occupied by Plaintiff. The difference in the number of square feet occupied by Plaintiff and the number of square feet previously occupied by Lumanair and now occupied by Carver, does not explain the difference in fundamental occupancy costs per sq. ft.

required of Plaintiff under its lease with Aurora, which is approximately ten times the cost of occupancy per sq. ft. under the terms of Aurora's leases with Lumanair and Carver.

20. In addition to the above, Plaintiff has been damaged by Aurora's preferential treatment of Lumanair and now Carver in multiple ways detailed hereinbelow including loss of profit margins and forced discounting of goods and services to meet the prices that Plaintiff's comparators were able and are able to offer to the public as a result of substantially lower overhead resulting from the disparate terms of the leases between Aurora and Plaintiff compared to the lease terms between Aurora and Lumanair and Aurora and Carver.

21. In addition to being violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the actions of Aurora are violative of the public policy annunciated in 49 U.S. Code §47107 requiring that "fixed base operators using the airport will be subject to the same charges." (49 U.S. Code 47107 (a) (5))

*Selective Enforcement of the Minimum Standards*

22. At all relevant times, JA and Lumanair were similarly situated, offering all or nearly all of the same services to the private and commercial flying community at the Airport.

23. At all relevant times, JA and Carver are similarly situated, offering all or nearly all of the same services to the private and commercial flying community at the Airport.
The land on which JA operates its FBO at the Airport is contiguous to the land on which Lumanair operated its FBO at the Airport, the same land on which Carver now operates its FBO at the Airport.

24. At all relevant times, the City adopted certain Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport

("Minimum Standards"), as required by the FAA at federally funded airports, including the Aurora Municipal Airport, which are to be enforced by airport owners and sponsors in a non-discriminatory manner in regard to all authorized Fixed Base Operators. Aurora is the owner and sponsor of the Airport.

25. Aurora, as the owner and sponsor of the Airport, requires Plaintiff and Lumanair and Carver to meet the Minimum Standards for Fixed Base Operators at the Airport, as such Minimum Standards may be in effect and amended from time to time, per the terms of each Fixed Base Operator's lease, specifically including, but not limited to, the leases between Plaintiff and Aurora, Lumanair and Aurora and Carver and Aurora.

26. The Minimum Standards provide, "It is the responsibility of the City of Aurora to protect its tenants from unreasonable and unfair competition." (Minimum Standards, **Exhibit No. 3**, page two, FAA 000265)

27. At all relevant times, JA and Lumanair were required by the terms of their leases with Aurora to comply with the Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport (the "Minimum Standards"), **Exhibit 3**, which Minimum Standards were incorporated in all relevant leases, and to which conformance was required.

28. Carver, the current occupier of the hangars and office space previously occupied by Lumanair, by the terms of its lease with Aurora, is required to comply with some but not all of the Minimum Standards, as exceptions to the Minimum Standards have been written into Carver's lease providing for certain accommodations not offered to Plaintiff, and thus requiring, among other things, less expenditure on the part of Carver than Aurora has required of Plaintiff. A copy

of the Minimum Standards, adopted by the City of Aurora, Ordinance No. 014-058, is attached hereto as **Exhibit No. 3**.

29.     Aurora failed to enforce compliance with the Minimum Standards in reference to Lumanair for many years, while at the same time, Aurora strictly enforced the Minimum Standards in regard to JA.

30.     JA was required to expend approximately $1,000,000 to install above ground fuel tanks in 2007 prior to beginning to do business at the Airport. Lumanair was never forced to install above-ground fuel tanks and continued to use very old underground fuel storage tanks for decades which were installed in 1979.

31.     There was no rational basis for Aurora to allow one similarly situated FBO, Lumanair, to continue using underground fuel storage tanks for many years, while forcing Plaintiff to expend the funds to install above-ground fuel storage tanks in 2007 before opening for business at the Airport.

32.     Aurora has not strictly enforced its Minimum Standards in regard to Carver, and, among other things, has allowed Carver to utilize underground fuel storage tanks until July of 2024, 17 years after Plaintiff was required to make the investment to build above ground fuel storage tanks, and 2 ½ years after Carver's lease began on January 1, 2022.

33.     There is no rational basis for Aurora to allow one similarly situated FBO, Carver, to continue using underground fuel storage tanks until 2024, while having forced Plaintiff to expend the funds to install above-ground fuel storage tanks in 2007 before opening for business at the Airport.

34.     Aurora's requirement that all Fixed Base operators utilize above-ground fuel storage tanks has been in effect since at least December 19, 2006, at which time the Minimum

Standards have required that all Fixed Base Operators maintain above-ground fuel storage tanks, sometimes referred to as "fuel farms" or "above ground fuel storage tanks". The requirements for such above ground fuel farms are found at paragraphs "1)" and "2)" of **Exhibit No. 3**, bates stamped pages FAA000265 and FAA000266.

35.     At the specific direction of Aurora, in order to be in strict compliance with the Minimum Standards, JA was required, at significant expense, to install and utilize only above-ground fuel storage tanks in 2007 before JA could begin doing business at the Airport, while its direct competitors and fellow tenants at the Airport, Lumanair and later Carver, were not forced, in reference to Lumanair, and have not been forced, in reference to Carver, to install above ground fuel tanks even to this day, 15 years after Plaintiff was required to spend approximately $1,000,000 to install above ground fuel storage tanks in or around 2007.

36.     Aurora has agreed to allow Carver Aero to use underground fuel storage tanks until at least 2024, despite the Minimum Standards which have required the use of above ground fuel storage tanks since at least December 19, 2006, and despite Plaintiff having been forced to comply with the same Minimum Standards, at considerable expense, requiring the use of above ground fuel storage tanks since 2007.

37.     There was no rational basis for Aurora to have allowed one similarly situated FBO, Lumanair, to continue using underground fuel storage tanks for many years, while forcing Plaintiff to expend the funds to install above-ground  fuel storage tanks in 2007 before opening for business at the Airport.

38.     There was no rational basis for Aurora to have entered into a lease with Carver allowing Carver until 2024, 2 ½ years after Carver's lease began on January 1, 2022, to expend the funds necessary to be in compliance with the Minimum Standards and install above-ground

fuel storage tanks, 17 years after enforcing the Minimum Standards in regard to Plaintiff , forcing Plaintiff to comply with the same requirement at great expense to Plaintiff, while Lumanair and Carver were not required to comply with the Minimum Standards and incur the same expense.

39.     Despite the clear mandate of Aurora's Minimum Standards, Lumanair, both before and after the expiration of its original leases, and after entering into a new lease with Aurora on August 1, 2020, continued to utilize underground fuel storage tanks and was never forced to invest in and install above-ground storage tanks.

40.     The City of Aurora sent Lumanair correspondence dated July 22, 2014, stating that "the City requires that not later than July 31, 2015, all fuel farms at the Airport shall be above ground facilities only in compliance with said Minimum Standards." But the City failed to enforce its requirement to install and use above-ground fuel storage tanks on the part of Lumanair.

41.     On January 1, 2022, the City entered into a new lease with Carver, allowing Carver until July 2024 to install above ground fuel storage tanks, 17 years after Plaintiff was required by Aurora to install above ground fuel storage tanks.

42.     There is no rational basis for Aurora to allow one similarly situated FBO, Carver, to continue using underground fuel storage tanks until 2024, 2 ½ years after Carver's lease began on January 1, 2022, while forcing Plaintiff to expend the funds to install above-ground fuel storage tanks 17 years prior in 2007 before opening for business at the Airport.

43.     Paragraph "7)" of the Minimum Standards, **Exhibit No. 3**, bates stamped page FAA000266, requires each FBO to maintain environmental liability insurance.

44.     Plaintiff was required to obtain and did obtain environmental liability insurance, at significant cost to Plaintiff.

45. Lumanair was not forced by its landlord, Aurora, to maintain environmental liability insurance in violation of the Minimum Standards.

46. Aurora entered into a new lease with similarly situated Carver on January 1, 2022 which does not require Carver to purchase environmental insurance.

47. There was and is no rational basis for Aurora to enter into a lease with Carver which does not require Carver to obtain environmental liability insurance, while requiring Plaintiff to maintain environmental liability insurance under the terms of Plaintiff's lease.

48. Paragraph "13)" of the Minimum Standards, **Exhibit No. 3**, bates stamped page FAA000267, prohibits "Co-Oping" of fuel with other entities. Co-Oping of fuel refers to the practice of an FBO selling or providing fuel to a customer which is not an FBO and which is not authorized to store, dispense, sell or re-sell fuel which then re-sells the same fuel to a third party.

49. As of July 22, 2014, Aurora found that Lumanair was Co-Oping fuel with another entity, "Chicago Jet Group", in violation of the Minimum Standards, and ordered Lumanair to cease.

50. On information and belief, Lumanair continued Co-Oping fuel with Chicago Jet Group or other entities.

51. JA has never engaged in Co-Oping of fuel.

52. Chicago Jet Group, located at the Airport is not a Direct Aviation Oriented Business as defined on page FAA000264 of the Minimum Standards and is not a FBO and therefore not allowed to store fuel, sell fuel or dispense aviation fuel. (Minimum standards, **Exhibit No. 3**, Roman Numeral III, Aircraft fuel and oil dispensing service.) Yet, Chicago Jet Group has been photographed dispensing fuel into jet aircraft on multiple and ongoing occasions and was engaged in Co-Oping of fuel with Lumanair for years. JA first brought this to the City's attention in 2008,

but the City failed for years to force Lumanair to cease and desist co-oping fuel with Chicago Jet Group or other entities. Plaintiff has sent photographs to Aurora clearly depicting aircraft being fueled by Chicago Jet on multiple occasions.

53.　　There has been no rational basis for Aurora to fail to enforce compliance with the Minimum Standards in regard to Co-Oping of fuel in regard to Lumanair, while enforcing compliance in reference to fuel co-oping in regard to Plaintiff.

54.　　Paragraph "14)" of the Minimum Standards, **Exhibit No. 3**, bates stamped page FAA000267, provides that all jet fueling operations shall require two jet fuel trucks of no less than 2,000 gallons and two Avgas fuel trucks for piston aircraft with a capacity of no less than 1,000 gallons.

55.　　Plaintiff was required to comply with the Minimum Standards in reference to purchase and operation of fuel trucks and all of JA's fueling trucks meet the required standards.

56.　　On information and belief, Lumanair did not meet the Minimum Standards and operated a fuel truck with substantially less capacity than required under the Minimum Standards.

57.　　There was no rational basis for Aurora to have strictly enforced Plaintiff to comply with the Minimum Standards in this regard while not enforcing Lumanair to obtain and maintain the equipment required at the Airport under the Minimum Standards.

58.　　The Minimum Standards at paragraph "17)" (**Exhibit No. 3** , bates stamped page FAA000268) requires that all aircraft fuel storage facilities, sometimes referred to as "fuel farms", shall be in compliance with the Illinois Office of the State Fire Marshal (OSFM) rules, the Clean Water Act and have proper spill control.

59.     On March 27, 2019, the Office of The Illinois State Fire Marshal issued a notice of multiple violations in regard to Lumanair's underground fuel storage tanks. A copy of the notice of violations is attached hereto and marked **Exhibit No. 4**.)

60.     JA has always been in complete compliance with the Minimum Standards including required compliance with the rules of the Office of The Illinois State Fire Marshal.

61.     There is no rational basis for Aurora to have allowed Lumanair to store and sell aircraft fuel from fuel farms and other related equipment that did not meet the Minimum Standards, while at the same time requiring strict compliance on the part of Plaintiff.

62.     In addition to the fact that Lumanair was not required by Aurora to invest in above-ground fuel storage tanks, there was no spill protection in place at the fuel farms operated by Lumanair, other than a 5-gallon bucket that appeared to be capturing leaking fuel. (***See* Group Exhibit No. 5**.) Further, Lumanair's fuel farm was not secured in any way from access by the public or others who might tamper with the fuel, all in violation of the Minimum Standards.

63.     There is no spill protection provided by Carver at the fuel farm used by Caver and the fuel farm now operated by Carver is not secured in any way from access by the public or others who might tamper with the fuel, all in violation of the Minimum Standards.

64.     Plaintiff was at all times required to provide, and did provide, spill protection and security around its above-ground fuel tanks.

65.     There is no rational basis for the difference in treatment of Plaintiff and similarly situated Lumanair and similarly situated Carver in regard to fuel spill protection and securing its fuel storage facilities.

66.     Plaintiff reasonably relied on the assurances of the City of Aurora of the requirement of strict enforcement of Minimum Standards and that reliance induced JA to move its facility to Aurora Airport and invest over $10,000,000.

67.     The City failed to enforce the published Minimum Standards in regard to similarly situated Lumanair, and subsequently in regard to similarly situated Carver, while strictly enforcing the Minimum Standards in regard to Plaintiff.

68.     There is no rational basis for the City's disparate treatment of Plaintiff in comparison to similarly situated Lumanair and similarly situated Carver which resulted in substantial expenditures on the part of Plaintiff, causing Plaintiff to expend millions of dollars to be in compliance with the Minimum Standards, while similarly situated Lumanair and similarly situated Carver were not required or forced by the City to comply with the Minimum Standards, and not forced by the City to expend similar funds in order to be and remain in compliance with the Minimum Standards. That situation created an unreasonable, unfair and uncompetitive situation at the Airport unjustifiably favoring similarly situated Lumanair and subsequently favoring similarly situated Carver and harming Plaintiff.

69.     Plaintiff must service its debt incurred in complying with the Minimum Standards, while similarly situated Lumanair was not required, or if required, was not forced to commit capital to comply with the Minimum Standards, thereby leaving similarly situated Lumanair with an unfair business advantage, allowing similarly situated Lumanair to undercut the costs of services and fuel offered by JA, since similarly situated Lumanair was not forced by Aurora to incur the expense required to comply with the Minimum Standards, as a direct result of the City's disparate enforcement of the Minimum Standards and other regulations in regard to similarly situated Lumanair, with no rational basis for the difference in treatment.

70. Carver enjoys special treatment by the City with greatly reduced expenditure requirements, continuing the unfair and disparate treatment of Plaintiff in comparison to Lumanair's purchaser, Carver, with no rational basis for the difference in treatment.

*The Leases*

71. Lumanair entered into three leases with the City of Aurora, pertaining to three separate parcels on the Airport occupied by Lumanair. The earliest of the three leases with Lumanair was entered into on March 1, 1982 (**Exhibit No. 6**). On the same date, the City of Aurora entered into a lease with Lumanair and Charles J. Myler (**Exhibit No. 7**). The third lease for a separate parcel of land at the Airport was entered into on February 23, 1999 (**Exhibit No. 8**) (Collectively, the "Leases")

72. After defaulting on multiple obligations contained in Lumanair's leases, and after operating without any lease, in violation of the Minimum Standards, from March 1, 2019 to July 31, 2020, the City entered into a new lease with Lumanair on August 1, 2020 (**Exhibit No. 9**). That new lease was subsequently assigned to Carver. On January 1, 2022, the City entered into a new lease with Carver in reference to the same hangars and buildings previously occupied by Lumanair. (**Exhibit No. 10**)

73. All the Leases, including the new lease provided to Lumanair by the City on August 1, 2020 (**Exhibit No. 9**) and the new lease provided to Carver on January 1, 2022, (**Exhibit No. 10**), provide that the leases are subject to the Rules and Regulations of the Aurora Municipal Airport Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, ("Minimum Standards") as the same may be in effect or amended from time to time. Further, pursuant to the Minimum Standards, "It is the responsibility of the City of Aurora to protect its tenants from unreasonable or unfair competition." (Minimum Standards, **Exhibit 3**, page 2.)

74.     The Leases have been amended from time to time. However, the provision that the leases are subject to the Rules and Regulations of the Aurora Municipal Airport Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, as the same may be in effect or amended from time to time, remains.

75.     The 1999 lease (**Exhibit No. 8**) between Aurora and Lumanair prohibited Lumanair from using the leased premises for any activity or purpose other than "1) aircraft and aircraft parts storage and 2) rental of hangar and office space to others." (**Exhibit No. 8**, page 2, paragraph No. 5)

76.     Lumanair filed a Third Amended Verified Complaint in the Sixteenth Judicial Circuit Court, Kane County, on February 5, 2019 (**Exhibit No. 11** hereto). In its Third Amended Verified Compliant, Lumanair admitted under oath that it did in fact perform aircraft maintenance on the subject leased premises in direct violation of the 1999 lease. (*See* **Exhibit No. 11**, pages 7 and 8, paragraphs 21 and 22.)

77.     In 2015, prior to this action being filed, Aurora filed a complaint against Lumanair for Forcible Entry and Detainer in the Circuit Court of the Sixteenth Judicial Circuit, Kane County, Illinois, general Number 15 LM 508, seeking to evict Lumanair and seeking possession of the hangars and buildings leased to Lumanair. A copy of said complaint is attached hereto as **Exhibit No. 12**. In that Complaint, Aurora alleged Lumanair failed to follow City of Aurora Minimum Standards for Commercial Activities at the Aurora Municipal Airport with respect to installation of above ground fuel storage tanks and failed to provide books and records of its business as required by its lease.

78.     On July 22, 2015, Aurora amended its complaint to add the allegation Lumanair failed to follow Aurora's Minimum Standards in regard to remediation of underground fuel tanks. A copy of Aurora's Amended Complaint is attached hereto as **Exhibit No. 13**.

79.     On November 12, 2015, Aurora filed its Second Amended Complaint for Forcible Entry and Detainer adding the allegation Lumanair failed to maintain insurance policies as required by Aurora's Minimum Standards. A copy of Aurora's Second Amended Complaint is attached hereto as **Exhibit No. 14**.

80.     On September 15, 2016, Aurora filed its Third Amended Verified Complaint for Forcible Entry and Detainer, seeking to evict Lumanair, citing five separate breaches of its lease on the part of Lumanair and seeking possession of Lumanair's leasehold.  A copy of Aurora's Third Amended Verified Complaint is attached hereto as **Exhibit No. 15**.

81.     On April 18, 2018, Aurora filed its Fourth Amended Verified Complaint for Forcible Entry and Detainer, seeking to evict Lumanair, citing six separate breaches of its lease on the part of Lumanair and seeking possession of Lumanair's leasehold.  A copy of Aurora's Fourth Amended Verified Complaint is attached hereto as **Exhibit No. 16**.

82.     The terms of the Leases between Aurora and Lumanair, as amended, expired on February 28, 2019. Nonetheless, after numerous eviction notices and after the Leases had expired, the City allowed Lumanair to operate at the Aurora Airport without a lease for 17 months in violation of the Minimum Standards (**Exhibit 3,** page 1, first sentence) and businesses attempting to conduct commercial activities without a lease will be deemed in violation of the Minimum Standards, (**Exhibit 3**, fifth page).

83.     The Leases contained an option allowing Lumanair to extend its lease for a period of ten years provided: 1) Lumanair was not in default under any of the terms of the Leases; and provided 2) Lumanair gave Aurora written notice of its intent to exercise its option to extend the lease no later than January 31, 2019  in some cases and six months prior to the termination date of the lease, in reference to one of the leases.

84.     At the time of the termination of the Leases, February 28, 2019, Lumanair was in violation of numerous terms of the Leases, as demonstrated by the Verified Fourth Amended Complaint filed by Aurora, (**Exhibit No. 16**).

85.     At the time of the termination of the term of the leases, February 28, 2019, Lumanair had failed to provide written notice six months prior of its intent to exercise the option to renew in reference to two of its leases at the Airport with Aurora.

86.     Despite Lumanair's violations of its lease as alleged by Aurora in its Fourth Amended Complaint for Forcible Entry and Detainer, (**Exhibit No. 16**) and despite Lumanair's failure to provide timely notice of its intent to extend the term of its lease, Aurora allowed Lumanair to remain on its leasehold and to continue dispensing fuel and doing business with no lease whatsoever from March 1, 2019 until July 31, 2020.

87.     During the entire time Lumanair occupied the leased premises from 1982 through February 28, 2019, and from March 1, 2019 to July 31, 2020, Lumanair paid no rent to the City on the occupancy of the hangars and office buildings it occupied, paying only meager ground rent to the City of Aurora and, like Plaintiff, "additional rent" based on a percentage of gross receipts and fuel flowage charge of $0.05 per gallon.

88.     The Leases required Lumanair to surrender the hangars and office buildings it occupied to the City of Aurora at the termination of its leases.

89.     Aurora did not enforce the requirement that Lumanair surrender ownership of the hangars and office buildings it occupied at the termination of its leases, despite the clear language of its leases and despite years of litigation between Aurora and Lumanair wherein Aurora sought possession of Lumanair's leasehold, and alleged, under oath, Lumanair was in violation of its lease,

and despite Lumanair's failure to give timely notice to Aurora of its intent to exercise its option to extend its lease.

90.     Despite Aurora's allegations of multiple breaches of the leases between Aurora and Lumanair, and despite Lumanair's failure to provide notice of intent to exercise its option to extend the lease, Aurora passed Resolution No. R20-151 on July 28, 2020, approving and entering into a new lease with Lumanair on August 1, 2020. (A copy of Resolution No. R20-151 is attached hereto as **Exhibit No. 17**. A copy of the August 1, 2020 lease between Aurora and Lumanair is attached hereto as **Exhibit No. 9**).

91.     Aurora's allowance of a new lease to Lumanair on August 1, 2020, despite years of litigation between Aurora and Lumanair and Aurora's sworn allegations of Lumanair's violations and defaults under its lease, along with Aurora's allowance of Lumanair to remain in possession of the hangars and office space it occupied under a new lease requiring no payment of rent on the hangars and buildings it occupied, other than ground rent and, like Plaintiff, "additional rent" based on a percentage of gross receipts and fuel flowage charge of $0.05 per gallon, along with Aurora's refusal to rent the same hangars and office space to Plaintiff at fair market value, and allowing Lumanair to maintain ownership of the buildings (to the detriment of the taxpayers), is based on and demonstrates animus on the part of Aurora toward Plaintiff, which was and is paying approximately $500,000 in rent equivalents per year (in addition to "Additional Rent" based on a percentage of gross receipts and in addition to Plaintiff's requirement to pay fuel flowage charge of $0.05 per gallon of fuel sold) under the terms of its lease with Aurora and constituted Aurora intentionally and unlawfully treating two similarly situated businesses differently with no rational basis for the difference in treatment.

92.     The August 1, 2020 lease between Aurora and Lumanair allowed Lumanair to maintain ownership of the hangars and buildings it occupied at the Airport located on land owned by the City at the Airport, and did not require Lumanair to surrender the buildings to Aurora, despite the provisions of Aurora's Lease with Lumanair, all to the detriment of Plaintiff, which was, from the inception of its tenancy at the Airport, required under the terms of its lease to pay substantial amounts of rent equivalents to occupy its buildings and hangars.

93.     There was no rational basis for Aurora's disparate treatment of Plaintiff in comparison to Aurora's treatment of Lumanair, allowing Lumanair to remain in possession of the buildings it occupied after termination of it lease without paying rent or rent equivalents, even though Lumanair had paid no rent or rent equivalents for decades, while Plaintiff was required to pay an average of approximately $500,000 per year in rent equivalents, in violation of Plaintiff's right to equal protection under the law and in violation of the Minimum Standards providing it is the responsibility of the City of Aurora to protect its tenants from unreasonable and unfair competition.

94.     The August 1, 2020 lease between Aurora and Lumanair required Lumanair to install above ground fuel storage tanks and to remove underground fuel storage tanks by August 1, 2022, 15 years after Plaintiff was required to make the substantial investment to install above ground fuel storage tanks.

95.     The August 1, 2020 lease between Aurora and Lumanair: 1) removed all requirements for Lumanair to maintain liability insurance as required under the City's Minimum Standards, other than as otherwise required under the August 1, 2020 lease.

96.     The City offered no such accommodations or modifications of the Minimum Standards to Plaintiff, with which Plaintiff was required to comply under the terms of Plaintiff's

lease with Aurora. Plaintiff continues to incur the expenses required to remain in compliance with the Minimum Standards that Aurora did not require of Lumanair and does not require of Carver.

97.     All of the above constituted Aurora intentionally and unlawfully treating similarly situated businesses differently with no rational basis for the difference in treatment, and any claim of a rational basis by Defendant would be pretextual.

98.     During the period from March 1, 2019 to July 31, 2020, while Lumanair remained on its former leasehold without a lease, Plaintiff, on multiple occasions, offered in writing to lease all or any portion of the hangars and office buildings occupied by Lumanair at the current fair market rate, approximately $8.50 per sq. ft.

99.     After a long period of no response, Aurora eventually declined Plaintiff's offer to lease the space, which was provided to Lumanair for no building rent whatsoever, depriving the citizens of Aurora of more than $700,000 per year in rental income to which the citizens of Aurora were and are entitled, demonstrating either animus toward Plaintiff or extraordinary and inexplicable bias in favor of Lumanair, or both, devoid of any rational basis, particularly in view of the fact the Airport had been operating at a substantial deficit for years and had been attempting to evict Lumanair for approximately five years on the basis of multiple defaults on the part of Lumanair.

100.     The above constituted Aurora intentionally and unlawfully treating two similarly situated businesses differently with no rational basis for the difference in treatment, as Aurora leased hangars and office buildings to Plaintiff with required rent equivalents of approximately $500,000 per year, but agreed to lease hangars and office space to similarly situated Lumanair for no building rent whatsoever. Any claimed rational basis on the part of Aurora would be pretextual.

101.     On July 27, 2021, Aurora passed Resolution No. R21-205 whereby Aurora allowed Lumanair to exercise its right under its lease to assign its lease to Carver, which subsequently took

21

over possession of the hangars and office buildings previously occupied by Lumanair and continued to operate the FBO and business previously operated by Lumanair. A copy of Resolution No. R21-205 is attached hereto as **Exhibit No. 18**.

102.    On January 11, 2022, Aurora passed Resolution No. R22-006 authorizing and approving the lease of the same hangars and office buildings to Carver which were previously leased to Lumanair, whose lease had been assumed by Carver on or about July 27, 2021. A copy of Resolution No. R22-006 is attached hereto as **Exhibit No. 19**.

103.    A copy of the lease between Aurora and Carver, approved pursuant to Resolution No. R22-006, purportedly effective January 1, 2022, is attached hereto as **Exhibit No. 10**.

104.    The terms of the Lease between Aurora and Carver (**Exhibit No. 10**) require Carver to install above ground fuel storage tanks by July 1, 2024, 17 years after Plaintiff was required to incur the expense to install above ground fuel storage tanks.  Aurora's allowance of Carver to make the investment to install above ground fuel storage tanks 17 years after requiring Plaintiff to do so constituted Aurora intentionally and unlawfully treating two similarly situated businesses differently with no rational basis for the difference in treatment, and any claim of a rational basis by Defendant would be pretextual.

105.    The terms of the Lease between Aurora and Carver purport to require Carver to expend up to $10,000,000 for improvements to the property occupied and owned by Carver at the Airport by December 31, 2033, provided however, that Carver is 1) required to expend only $3,000,000 by December 31, 2026; 2) required to expend only an additional $3,000,000 by December 31, 2031; and 3) required to spend an additional $4,000,000 by December 31, 2033.

106.    However, the terms of the Lease between Aurora and Carver actually allow Carver to spend 40% of its commitment, $4,000,000 of its $10,000,000 commitment, on purchasing another

22

business at the Airport, in which case the amount required to be expended by Carver on its leasehold will be reduced to only $6,000,000. Further, in the alternative, the construction rider to the January 1, 2022 lease between Aurora and Carver allows Carver to avoid any investment in its leasehold, or at a minimum to avoid expenditure of $4,000.000, to the extent Carver is the designated procurer of an additional tenancy or ownership of facilities at the Airport by any entity unrelated to or not under the control of Carver, in which case the entire requirement of investing $10,000,000, or at least $4,000,000 of the required improvements, as a condition of the Lease shall be considered satisfied.

107. No such offer, nor anything remotely similar to such offer was made to Plaintiff, a similarly situated business at the Aurora Airport.

108. There is no rational basis for the discriminatory difference in the terms of the leases offered to Plaintiff and to Carver, which create and insure unreasonable and unfair competition and which are violative of Plaintiff's rights under the Fourteenth Amendment to the Constitution of the United States of America and Article I of the Constitution of the State of Illinois which prohibit discrimination and provide for equal protection under the law.

109. The City required Plaintiff to expend $10,000,000 as a condition of Plaintiff's lease at the inception of the occupancy of Plaintiff's leasehold at the Airport, including the purchase of a large corporate hangar, commonly knowns as the "BP Hangar", and to immediately surrender ownership of that hangar and to deed that hangar to the City at the inception of Plaintiff's lease.

110. Plaintiff has been required by the terms of its lease to expend $10,000,000 and to pay principal and interest on its required investment to purchase and improve hangars and office space belonging to the City at a cost averaging approximately $500,000 per year, while Aurora made no comparable requirement of Lumanair or Carver, constituting Aurora intentionally and unlawfully

treating two similarly situated businesses differently with no rational basis for the difference in treatment, and any claim of a rational basis by Defendant would be pretextual.

111.    Lumanair was not required or forced under the terms of its lease with the City to expend any amount to improve its leasehold except to install above ground fuel storage tanks by 2022, 15 years after Plaintiff was required to make that investment, which Lumanair never installed and which Carver never installed under Lumanair's lease assigned to Carver, with the approval of the City.

112.    Under the terms of Carver's new lease, (**Exhibit No. 10**) it is required to expend far less than Plaintiff to improve its leasehold and allowed to make such expenditures, in modest increments, over a much longer period of 12 years, or in the alternative, according to the terms of the Construction and Capital Improvements Rider to the Carver Lease, and depending on the interpretation of the Rider, to avoid at least $4,000,000 of the required improvements by merely being the designated procurer of an additional tenancy or ownership of facilities at the Airport.

113.    By the terms of Aurora's lease with the City, Carver is allowed to expend 40% of its commitment, $4,000,000 of its commitment, on the purchase of another business, rather than on improvements to its leasehold, or to merely be the designated procurer of an additional tenancy or facility, in which case Carver will be excused from spending at least $4,000,000 of its commitment, if not more.

114.    The City made no such accommodation or offer to Plaintiff to spend any portion of its $10,000,000 commitment on the purchase of another business at the Airport, or to avoid 40% of its commitment by simply being the designated procurer of an entity unrelated or not under the control of Plaintiff.

115.    All of the above constitute intentional and unlawful treatment of two similarly situated businesses differently by Aurora with no rational basis for the difference in treatment, and any claim of a rational basis by Defendant would be pretextual.

116.    The Fourteenth Amendment to the Constitution of the United States of America and Article I of the Constitution of the State of Illinois prohibit discrimination and provide for equal protection under the law.

117.    42 U.S.C. §1983 prohibits the deprivation of any rights or privileges provided under the Constitution of the United States of America including deprivation of equal protection under the law.

118.    In addition, the Federal Aviation Administration, pursuant to the enabling statute, in 49 U.S. Code §47107, requires that federally funded airports, such as the Aurora Municipal Airport, strictly comply with FAA Airport Assurances (the "Assurances"). A copy of the FAA Airport Assurances, as effective March 2014, is attached hereto as **Exhibit No. 20**.

119.    In addition to the Fourteenth Amendment to the Constitution of the United States of America and Article I of the Constitution of the State of Illinois, the Assurances prohibit the Airport from engaging in ***any form of economic discrimination***. Specifically, at paragraph 22. C., the Assurances provide that "each fixed base operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed base operators making the same or similar uses of such airport and utilizing the same or similar facilities." (*See* paragraph 22. C. found on pages 10 of 20 and 11 of 20 of **Exhibit No. 20**.)

*Economic Disparity Proximately caused by Aurora's Differential Treatment of Plaintiff*

120.    Plaintiff  was induced by the City of Aurora to move its base of operations from the DuPage County Airport to the Aurora Airport, and representatives of JA were told in no uncertain

terms by Aurora's Airport Manager that JA would be required to comply with and strictly adhere to the Minimum Standards in order to be allowed to conduct business as a FBO at the Aurora Airport.

121.    Plaintiff did in fact comply with all of the Minimum Standards for Fixed Base Operators, including, among other things, investing in the construction of above ground fuel tanks, maintaining an avionics facility to sell and service aeronautical avionics equipment, purchasing environmental insurance coverage and much more. Similarly situated Lumanair and similarly situated Carver were not, and still are not, required to comply with Aurora's Minimum Standards. That disparity has proximately caused significant economic detriment to Plaintiff as stated herein.

122.    Plaintiff initially spent over $10,000,000, in 2007 dollars, in order to satisfy the terms of its lease and to comply with the Minimum Standards promulgated by Aurora as a condition of being allowed to operate its FBO business at the Airport.

123.    While strictly enforcing the Minimum Standards in regard to Plaintiff, it was not enforcing the Minimum Standards in regard to Plaintiff's similarly situated competitor, Lumanair, which was operating in violation of the Minimum Standards and had not made the investment necessary to comply with the Minimum Standards, which the City required of Plaintiff, including, but not limited to, Lumanair's failure to invest in above-ground fuel tanks, or to provide fuel spill prevention equipment, and its failure to purchase the required environmental claim insurance, and operate fuel trucks as required under the Minimum Standards, and much more.

124.    Lumanair continuously violated the Minimum Standards by engaging in fuel "co-oping", all to the economic detriment of Plaintiff.

125.    Because Lumanair, in violation of the Minimum Standards, had not made the investment to be in compliance with the Minimum Standards, Lumanair was able to use its open

26

violation of the Minimum Standards, unchecked by the City, to its economic advantage by selling fuel at prices well below the prices that could be offered by Plaintiff, and was able to offer maintenance and avionics services well below the prices that could be afforded by Plaintiff, and was able to offer hangar space for rent at prices well below the prices that could be offered by JA, and was able to offer flight instruction and airplane rentals at prices well below the prices that could be offered by JA because Lumanair was not forced by the City to make the investment required to meet the Minimum Standards even though such compliance was required under Lumanair's lease with Aurora, thus minimizing Lumanair's overhead as a result of the City failing to enforce the Minimum Standards in regard to Lumanair, while strictly enforcing the Minimum Standards in regard to JA.

126. The economic advantage to Lumanair and disadvantage to Plaintiff was exacerbated by the City of Aurora allowing Lumanair to keep its buildings at the expiration of Lumanair's leases, and failing to charge Lumanair any rent on its hangars and office buildings, other than minimal ground rent and, like Plaintiff, "additional rent" based on a percentage of gross receipts and fuel flowage charge of $0.05 per gallon, rather than market comparable rent as required by the FAA for approximately years, all increasing the cost of doing business on the part of similarly situated JA, devoid of any rational purpose, despite the fact the City had the opportunity to correct the situation when drafting and establishing the terms of the new lease granted to Lumanair on August 1, 2020 and the new lease granted to Carver on January 1, 2022, and despite the fact the City had filed multiple Complaints in State court to evict Lumanair for multiple violations of its lease, and yet failed to evict Lumanair.

127. Lumanair, then used its illicit advantage, facilitated by the City's refusal to enforce the Minimum Standards in regard to Lumanair, while strictly enforcing the Minimum Standards in regard to Plaintiff, to approach the customers of JA and solicit them to purchase fuel, and other

products and services from Lumanair rather than from JA, at substantial discounts, which Lumanair was able to offer to JA's customers because Lumanair was not forced by the City to make the investments required to be in compliance with the Minimum Standards that JA was required to make and because the City of Aurora failed to charge Lumanair market comparable rent as required by the FAA for approximately years, resulting in increased costs to JA for rent alone of approximately $500,000 per year, exclusive of other damages.

128. The City's lack of enforcement of its Minimum Standards in regard to Lumanair, while strictly enforcing compliance with the Minimum Standards on the part of Plaintiff, allowed Lumanair to minimize its overhead by failing and refusing to make the investment required of Plaintiff to meet the Minimum Standards.

*The Bond*

129. The City provided Lumanair with the proceeds of a general obligation bond, known as the "Series 1992C Bond" (the "Bond") used by Lumanair (and a separate entity owned by Lumanair or its principals) to purchase and rehabilitate and construct hangars and office space used by Lumanair in Lumanair's business. The City made no such offer or accommodation to Plaintiff.

130. Lumanair signed agreements, including an Operating Agreement and a Management Agreement, attached as **Exhibit 21** and **Exhibit 22**, respectively, requiring Lumanair to pay all principal and interest on the Bond. However, when Lumanair was unable to make the required payments under the Bond, the City forgave the balance owed by Lumanair in the amount of $5,758,379.00.

131. The City's provision of the proceeds of the Bond to Lumanair was not disclosed to Plaintiff at the inception of its lease, and the City's forgiveness of the balance owed by Lumanair

28

in the amount of $5,758,379.00, which was also not disclosed to Plaintiff, helped to create and exacerbate a substantial unfair economic advantage in favor of Lumanair and against Plaintiff devoid of any rational purpose.

132.    The City refused to offer financing to Plaintiff through a General Obligation bond, as had been provided to Lumanair, which the City had the opportunity to do, which would have provided financing at more favorable rates than the public market, despite the fact the City provided financing through the Bond to Lumanair, and then forgave the entire balance of the Bond when Lumanair was unable to meet its obligations. Instead, the City issued a Special Facility Revenue Bond which had to be purchased by Plaintiff's lender and paid in its entirety by Plaintiff, with no obligation for payment by the City, unlike the General Obligation Bond of the City of Aurora (the 1992C Bond), the proceeds of which were provided to and for the use of Lumanair.

*The City's knowledge and participation*

133.    The City of Aurora in the ways described herein, in violation of its own Minimum Standards, and in deferentially enforcing its Minimum Standards allowed similarly situated Lumanair to operate as a FBO at the Aurora Airport without requiring Lumanair to meet the Minimum Standards strictly required of Plaintiff.

134.    Similarly situated Lumanair operated at the Airport from March 1, 2019 through July 31, 2020 without a lease in direct violation of the Minimum Standards and without paying market comparable rent, while Plaintiff was required by the terms of its lease to pay rent equivalents on its required $10,000,000 investment averaging $500,000 per year. Aurora's City officials were aware of this situation and were informed and reminded of the disparities referenced in this Amended Complaint on multiple occasions by representatives of Plaintiff.

135.    On August 1, 2020, the City had the opportunity to correct the economic imbalance that existed under the terms of the leases between the City and Lumanair and the City and Plaintiff when the City entered into a new lease with similarly situated Lumanair.

136.    The new lease drafted by the City still charged no rent on the hangars and office buildings occupied by Lumanair, despite the fact Lumanair's prior lease, which terminated on February 28, 2019, required Lumanair to surrender the buildings it occupied to the City, so the City could begin collecting rent from the occupants of those hangars and buildings, to which the citizens of Aurora were entitled, even though the Airport had been operating at a deficit.

137.    During the period of Lumanair's occupancy of the hangars and buildings, Lumanair paid no rent or rent equivalents for the occupancy of the hangars and office buildings it occupied, while Plaintiff was required by the terms of its lease to pay rent equivalents, on its required $10,000,000 investment, averaging approximately $500,000 per year.

138.    Both Lumanair and Plaintiff were required to pay "Additional Rent" in the amount of 1.5% of gross receipts and a fuel flowage charge of $0.05 per gallon of fuel sold, but only Plaintiff was required by the terms of its lease to pay Rent Equivalents in the amount of approximately $500,000 per year.

139.    On or about July 27, 2021, Aurora passed City of Aurora Resolution No. R21-205 whereby Aurora allowed Lumanair to exercise its right under its lease to assign its lease to Carver. From that point until January 1, 2022, similarly situated Carver was allowed to operate what had been Lumanair's business and occupy the same hangars and buildings previously occupied by Lumanair at the Airport paying no rent on its occupancy of the hangars and buildings whatsoever, while Plaintiff was required by the terms of its lease to pay rent equivalents on its required $10,000,000 investment averaging $500,000 per year.

140.     Both Carver and Plaintiff were required to pay "Additional Rent" in the amount of 1.5% of gross receipts and a fuel tax of $0.05 per gallon of fuel sold, but only Plaintiff was required by the terms of its lease to pay Rent Equivalents in the amount of approximately $500,000 per year to occupy and conduct business out of the hangars and office space it occupied.

141.     On or about January 1, 2022, the City had the opportunity to correct the economic imbalance that existed under the terms of the leases between the City and Carver and the City and Plaintiff when the City entered into a new lease with similarly situated Carver, but the City did correct the situation. Instead Aurora knowingly and intentionally entered into a new lease with Carver allowing Carver to pay no rent on the hangars and buildings previously occupied by Lumanair, and allowing Carver to spend funds on improvements to the leasehold, little by little, in smaller increments, over a period of 12 years – and even then allowing Carver to spend a large portion, 40% of its commitment, on any other business at the Airport, or to be excused from paying at least 40% of its commitment if Carver was a designated procurer of an additional tenancy or facility at the Airport, while Plaintiff was required by the terms of its lease to make its full investment at the inception of its lease and to pay rent equivalents on its required $10,000,000 investment averaging $500,000 per year.

142.     Plaintiff was not allowed to spend any portion of its commitment on the purchase or acquisition of any other business, or to reduce its commitment by procuring another tenant or facility at the Airport.

143.     There was and is no rational basis for the disparity in the terms of the lease offered by Aurora to Plaintiff compared to the terms of the leases offered to Lumanair and then to Carver by Aurora, and any purported rational basis would be pretextual.

31

144.    City officials and policymakers of Aurora, including but not limited to the City's appointed airport managers, Bob Reiser, Beth Penesis and Steve Andras, and the City's Chief Management officer in the Mayor's office, Alex Alexandrou, and members of the Aurora Airport Advisory Board and members of City of Aurora Committees and the Aurora City Council and the past and present Mayors of the City of Aurora were aware of the discrepancies and disparities between the terms of the lease offered to Plaintiff and the terms of the leases offered to Lumanair, and they were involved in the approval and the intentional and deliberate decision to issue the 2006 lease and the 2007 lease to Plaintiff and the decision to issue a new lease to similarly situated Lumanair, and allowing Lumanair to keep its buildings, charging no rent on the hangars and office buildings occupied by Lumanair despite Lumanair's multiple lease violations, to the prejudice of Plaintiff and depriving the citizens of Aurora of much needed revenue.

145.    City officials and policymakers of Aurora, including but not limited to the City's appointed airport managers, Bob Reiser, Beth Penesis and Steve Andras, and the City's Chief Management officer in the Mayor's office, Alex Alexandrou, and members of the Aurora Airport Advisory Board and members of City of Aurora Committees and the Aurora City Council and the past and present Mayors of the City of Aurora were aware of and involved in the approval of and the intentional and deliberate decision to file suit for possession of the buildings and hangars occupied at the Aurora Airport by Lumanair and then to fail to take possession of the hangars and office buildings occupied by Lumanair at the termination of its lease in February 2019 and the intentional and deliberate decision to fail to enforce the City's own Minimum Standards requiring the use of above ground fuel storage tanks by Lumanair and by Carver.

146.    City officials and policymakers of Aurora, including but not limited to the City's appointed airport managers, Bob Reiser, Beth Penesis and Steve Andras, and the City's Chief

Management officer in the Mayor's office, Alex Alexandrou, and members of the Aurora Airport Advisory Board and members of City of Aurora Committees and the Aurora City Council and the Mayor of the City of Aurora were aware of the intentional and deliberate decision to allow similarly situated Carver to make a smaller investment over a much longer period of time, rather than at the inception of its lease and the intentional and deliberate decision to allow Carver to use 40% of its investment to purchase another business at the airport, or to be excused from paying at least 40% of its commitment if Carver was a designated procurer of an additional tenancy or facility at the Airport, while allowing Plaintiff no such favorable terms.

147.    There was no rational basis for the disparity in the terms of the  lease offered by Aurora to Plaintiff compared to the terms of the leases offered to Lumanair and then to Carver by Aurora, and any purported rational basis would be pretextual.

148.    The City's disparate treatment of Plaintiff in comparison to similarly situated Lumanair as indicated above and the City's issuance of a new lease to Lumanair in August 2020, requiring no rent payments by Lumanair, evidenced the City's policy, custom and practice of treating Plaintiff and Lumanair substantially differently and unfairly without any cognizable rational basis for the favorable treatment of Lumanair compared to the City's treatment of Plaintiff, and any purported rational basis would be pretextual.

149.    The City's approval of the January 1, 2022 lease to Carver on substantially more favorable terms than the City's lease with Plaintiff demonstrates the City's continuing deliberate and intentional policy, custom and practice of treating Plaintiff in a disparate and unfair manner by comparison to the City's treatment of similarly situated Carver, with no cognizable rational basis for the favorable treatment of Carver compared to the City's treatment of Plaintiff, and any purported rational basis would be pretextual.

150.     The history of the City's unjust disparate and favorable treatment of similarly situated Lumanair compared to the City's treatment of similarly situated Plaintiff, and the City's failure to move forward with eviction of Lumanair, and the City's failure to take ownership and occupancy of the hangars and office space leased to Lumanair despite Lumanair's defaults, and despite the City's contractual right to take ownership of the buildings per the terms of Lumanair's expired lease, and the City's inexplicable agreement to enter into a new lease with Lumanair charging no rent on Lumanair's occupancy of its hangars and office space, evidence the disparate policy, custom and practice of the City and demonstrate the fact the City never had any intention of enforcing the City's Minimum Standards in regard to Lumanair or charging Lumanair rent on the space it occupied, as the City insisted on charging Plaintiff.

151.     There was never any rational basis for the City's disparate treatment of Plaintiff compared to similarly situated Lumanair, and any purported rational basis would be pretextual.

152.     The City's agreement to enter into a lease with Carver on substantially more favorable terms than the City's lease with Plaintiff demonstrates the City's continuing intention of moving forward with the same unequal treatment of Plaintiff compared to similarly situated Carver. There is no rational basis for the City's disparate treatment of Plaintiff compared to similarly situated Carver, and any purported rational basis would be pretextual.

153.     The City's forgiveness of Bond payments by Lumanair and refusal to provide similar financing through a general obligation bond for the benefit of Plaintiff resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

154.     The City's policy, custom and practice of allowing Lumanair, and now Carver, to continue using underground fuel storage tanks, while requiring Plaintiff to expend millions of

34

dollars to meet the Minimum Standards including construction of above ground fuel storage tanks, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

155.     The City's policy, custom and practice of allowing Lumanair, and now Carver, to continue operations without purchasing the environmental insurance required by the City of Plaintiff, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

156.     The City's policy, custom and practice of allowing Lumanair to occupy its hangars and office space rent free, both before and after the City issued a new lease to Lumanair in August, 2020, while requiring Plaintiff to pay rent equivalents of approximately $500,000 per year, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

157.     The City's policy, custom and practice of willfully failing to stop Lumanair from Co-Oping fuel for many years, while prohibiting Plaintiff from doing the same, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

158.     The City's policy, custom and practice of willfully allowing Lumanair, and now Carver, to avoid installation of proper fuel spill prevention equipment, while requiring Plaintiff to install and maintain the same, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

159.     The City's policy, custom and practice of willfully allowing similarly situated Lumanair, and now similarly situated Carver, to continue to use underground fuel storage tanks,

while requiring Plaintiff to install above ground fuel storage tanks 15 years ago, has resulted in economic discrimination to Plaintiff on the part of the City, with no cognizable rational basis, and any purported rational basis would be pretextual.

160.   The City has continued to demonstrate its discriminatory policy, custom and practice by willfully, knowingly and intentionally issuing a new lease to Carver, effective January 1, 2022 through December 31, 2051 allowing Plaintiff's similarly situated comparator, Carver, to continue to use underground fuel storage tanks through July 1, 2024, 17 years after Plaintiff was required to expend the capital and to pay interest on the expenditure to install above ground fuel storage tanks; and by not requiring Carver to make reasonably comparable investments in its leasehold, and not being required to pay rent equivalents reasonably comparable to Plaintiff's; and by allowing Carver to spread out its required investments over a period of 12 years, despite requiring Plaintiff to spend its required investment immediately before beginning to operate at the Airport, and by allowing Carver to spend 40% of its required investment on the acquisition of other businesses at the Airport, or to be excused from paying at least 40% of its commitment if Carver is a designated procurer of an additional tenancy or facility at the Airport, while requiring Plaintiff to spend all of its investment at the leasehold property on buildings belonging to the City, the City having not allowed Plaintiff to use any of its invested capital, required under the terms of its lease, on any other business or procurement. Theses disparities have no cognizable rational basis, and any purported rational basis would be pretextual.

161.   The City has continued to demonstrate its discriminatory policy, custom and practice by willfully, knowingly and intentionally transferring, allowing and/or facilitating the transfer and/or agreeing to the transfer of the telephone number for the Airport to Lumanair or Carver, thereby insuring that any phone calls directed to the telephone number identified with the

Airport for many years would be directed to Carver, and not directed to Plaintiff, providing Carver with an advantage in securing customers and providing services for persons calling the phone number associated with the Airport for many years. Aurora made no offer or arrangement or even notice of its intent to allow the transfer of its phone number to similarly situated Plaintiff, offering this valuable assistance to similarly situated Carver or Lumanair only to obtain this valuable business asset.

162. This disparity along with all the other actions on the part of Aurora referenced herein were accomplished and allowed by Aurora with no rational basis to support Aurora's differential treatment of Plaintiff and similarly situated Lumanair and subsequently similarly situated Carver and constitute Aurora acting with clear bias in favor of Lumanair and subsequently Carver and prejudice against Plaintiff. Any assertion of a rational basis on the part of Aurora for the transfer of its phone number to Carver, along with the other incidents of bias on favor of Lumanair and Carver referenced herein would be pretextual.

163. On information and belief, from at least January 1, 2021 through at least December 31, 2021, Aurora failed to collect fuel flow charges from Lumanair and/or from Carver in a timely manner, while collecting fuel flow charges from Plaintiff.

164. This disparate and discriminatory treatment by Aurora in favor of Lumanair and Carver acted to the prejudice of Plaintiff and resulted in Plaintiff being required to pay fuel flow charges while similarly situated Lumanair and Carver were not charged fuel flow charges during the stated period or if charged, not collecting fuel flow charges, if not longer, resulting in thousands of dollars of costs to Plaintiff that were not incurred during the referenced period by similarly situated Lumanair and Carver.

165.    There was and is no rational basis for Aurora's disparate treatment of Plaintiff in comparison to similarly situated Lumanair and Carver and any suggested rational basis would be pretext only.

166.    On information and belief, from January 1, 2021 through at least December 31, 2021, Aurora failed to collect additional rent charges from Lumanair and from Carver in a timely manner, while collecting additional rent charges from Plaintiff.

167.    This disparate and discriminatory treatment by Aurora in favor of Lumanair and Carver acted to the prejudice of Plaintiff and resulted in Plaintiff being required to pay additional rent charges while similarly situated Lumanair and Carver were not charged additional rent charges during the stated period, if not longer, resulting in thousands of dollars of costs to Plaintiff that were not incurred during the referenced period by similarly situated Lumanair and Carver. There was and is no rational basis for Aurora's disparate treatment of Plaintiff in comparison to similarly situated Lumanair and Carver and any suggested rational basis would be pretext only.

168.    As alleged above, Plaintiff has been and continues to be intentionally treated differently by the City from its similarly situated comparators at the Airport, both Lumanair and now Carver, demonstrating long standing discriminatory policy, custom and practice on the part of Aurora and there is no rational basis for the difference in treatment, and any purported rational basis would be pretextual.

*Damages*

169.    As a result of the discriminatory treatment and policy, custom and practice of the City of Aurora, Plaintiff has sustained severe and ongoing economic damages referenced herein, including but not limited to the following, and not including the cost of the loss of use of the funds which Plaintiff also claims as damages:

38

170.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair  differently from Plaintiff as a result of the City's requirement that Plaintiff purchase a large hangar, knowns as the "BP Hangar", at a cost of $4,000,000 and then Plaintiff was required to immediately deed the BP Hangar to the City.

171.     The City did not require Lumanair, under its original leases or under the new lease issued to Lumanair on August 1, 2020 to purchase any building or structure or to deed any building or structure to the City and allowed Lumanair to keep the buildings it occupied for another 30 years instead of taking possession of the buildings pursuant to the terms of Lumanair's expired leases.

172.     There was no rational basis for this difference in treatment, and any purported rational basis would be pretextual.

173.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair  differently from Plaintiff as a result of the City's requirement that Plaintiff spend more than $5,000,000 to renovate buildings owned by the City and to construct a canopy to be used by any aircraft landing or departing from the Airport.

174.     The City did not require Lumanair, under its original leases or under the new lease issued to Lumanair in August 2020 to renovate any buildings or structures or to build a canopy to be used by any arriving or departing aircraft.

175.     There was no rational basis for this difference in treatment, and any purported rational basis would be pretextual.

176.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City's requirement that Plaintiff spend approximately $1,000,000 to install above ground fuel storage tanks before Plaintiff could begin doing business as a FBO at the Airport in 2008.

177.     The City did not force Lumanair to invest in or construct above ground fuel storage tanks under its original lease or under its new lease entered into in August 2020.

178.     There was no rational basis for this difference in treatment, and any purported rational basis would be pretextual.

179.     Between July 27, 2021 and January 1, 2022, when the City approved the assignment of Lumanair's lease to Carver, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Carver differently from Plaintiff as a result of the City's requirement that Plaintiff spend approximately $1,000,000 to install above ground fuel storage tanks before Plaintiff could begin doing business as a FBO at the Airport in 2008.

180.     The City did  not require Carver to install above ground fuel storage tanks at any time under the lease assigned to Carver by Lumanair. There was no rational basis for this difference in treatment, and any purported rational basis would be pretextual.

181.     Between January 1, 2022, when the City issued a new lease to Carver,  and the present, Plaintiff has been damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Carver differently from Plaintiff as a result of the City's requirement that Plaintiff spend approximately $1,000,000 to install above ground fuel storage tanks before Plaintiff could begin doing business as a FBO at the Airport in 2008.

182.     The City did  not and will not require Carver to install above ground fuel storage tanks until July 1, 2024, 17 years after JA was required to make the significant expenditure to install above ground fuel storage tanks at the Airport and 2 ½ years after Carver's lease began on January 1, 2022

183.     There was no rational basis for this difference in treatment, and any purported rational basis would be pretextual.

184.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City's substantially different lease terms and the City's disparate enforcement of the City's Minimum Standards which provided an economic benefit to Lumanair which resulted in Plaintiff being required to cut its margins on rental income by  approximately 20% resulting in estimated damages of $716,645 from November 27, 2007 until February 28, 2019.

185.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City's substantially different lease terms and the City's disparate enforcement of the City's Minimum Standards which provided an economic benefit to Lumanair which resulted in Plaintiff being required to cut its margins in its maintenance department by approximately 10% resulting in estimated damages of $611,633 from November 27, 2007 until February 28, 2019.

186.     Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City's provision for the benefit of Lumanair

a general obligation bond, knowns as the Series 1992C Bond. The City refused to offer a general obligation bond for the benefit of Plaintiff, resulting in Plaintiff being required to obtain its own financing arrangements at greater cost than required of Lumanair which was provided financing through a general obligation bond by the City.

187.    Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City's forgiveness of the amount due and owing by Lumanair for payments of principal and interest on the Bond in the amount of $5,758,379. The City offered no such accommodation to Plaintiff.

188.    Between November 27, 2007 and February 28, 2019, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City issuing leases to Lumanair and to Plaintiff with substantially different terms and substantially greater costs to Plaintiff per sq. ft. which allowed Lumanair to sell fuel at significant discounts which had to be matched by Plaintiff resulting in an estimated loss of .50 per gallon, totaling $2,725,247.

189.    Between March 1, 2019 through January 1, 2022 Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair and subsequently similarly situated Carver differently from Plaintiff as a result of the City issuing a new lease to Lumanair, later assigned to Carver with the approval of the City, with substantially more favorable terms and substantially lower costs to Lumanair compared to substantially greater costs to Plaintiff which allowed Lumanair and then Carver to sell fuel at significant discounts which had to be matched by Plaintiff resulting in an estimated loss of .50 per gallon, totaling $982,923.

42

190.     Between November 27, 2007 and July 31, 2020, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City issuing leases to Lumanair with substantially more favorable terms and lower costs to Lumanair than the lease issued to Plaintiff, resulting in Plaintiff paying $5,430,553 more than Lumanair in rent equivalents, at approximately $3.94 per sq. ft, compared to Lumanair which paid only $0.39 per sq. ft. for ground rent only.

191.     Between August 1, 2020 and January 1, 2022, Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair differently from Plaintiff as a result of the City issuing a new lease to Lumanair, subsequently assigned to similarly situated Carver with the approval of the City, with substantially more favorable terms and lower costs to Lumanair and Carver than the lease issued to Plaintiff, resulting in Plaintiff paying $731,868 more than Lumanair in rent equivalents, at approximately $3.94 per sq. ft, compared to Lumanair and Carver which paid $0.00 per sq. ft. for ground rent only.

192.     Between January 1, 2022 and July 1, 2024, Plaintiff has been and will be damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Carver differently from Plaintiff as a result of the City issuing a new lease to Carver with substantially more favorable terms and lower costs to Carver than the lease issued to Plaintiff resulting in Plaintiff paying $1,291,532 more than Carver in rent equivalents, at approximately $3.94 per sq. ft., compared to Carver which will pay $0.00 per sq. ft.

193.     Between July 1, 2024 and January 1, 2027, Plaintiff will be damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Carver differently from Plaintiff as a result of the City issuing a new lease to Carver with substantially

more favorable terms and lower costs to Carver than the lease issued to Plaintiff, resulting in Plaintiff paying $1,013,064 more than Carver in rent equivalents, at approximately $3.94 per sq. ft, compared to Carver which will pay approximately $0.85 per sq. ft. in rent equivalents.

194.    Between January 1, 2027 and January 1, 2032, Plaintiff will be damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Carver differently from Plaintiff as a result of the City issuing a new lease to Carver with substantially more favorable terms and lower costs to Carver than the lease issued to Plaintiff, resulting in Plaintiff  paying $912,257 more than Carver in rent equivalents, at approximately $3.94 per sq. ft, compared to Carver which will pay approximately $2.55 per sq. ft. in rent equivalents.

195.    Between November 27, 2007 and January 1, 2022, Plaintiff has been damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair and similarly situated Carver differently from Plaintiff as a result of the City issuing leases to Lumanair which terminated on February 28, 2019, and issuing a new lease to Lumanair on August 1, 2020, assigned to Carver with the approval of the City on July 27, 2021 which ran through December 31, 2021, with substantially more favorable terms and lower costs to Lumanair and Carver than the lease issued to Plaintiff, allowing Lumanair and Carver to operate without the expenditures required by the City's lease with Plaintiff, resulting in Plaintiff paying approximately $3,191,811 in interest payments not required of Lumanair or Carver by the terms of the original leases, and not required by the terms of the new lease to Lumanair of August 1, 2020 which was assigned to Carver with the approval of the City on July 27, 2021.

196.    From March 1, 2019 through January 1, 2022 Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair and subsequently similarly situated Carver differently from Plaintiff as a result of the City allowing

Lumanair to operate and sell fuel without a lease from March 1, 2019 until July 31, 2020 and then issuing a new lease to Lumanair on August 1, 2020 on terms far more favorable than the terms offered to Plaintiff resulting in Plaintiff having to reducing its margins on rental income by an estimated 20% resulting in damages of $313,914.

197.    From March 1, 2019 through January 1, 2022 Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair and subsequently Carver differently from Plaintiff as a result of the City issuing a new lease to Lumanair, later assigned to Carver with the approval of the City, with substantially more favorable terms and substantially lower costs to Lumanair compared to substantially greater costs to Plaintiff which allowed Lumanair and then Carver to sell maintenance services at a significant discount which had to be matched by Plaintiff resulting in an estimated loss of approximately $134,591.

198.    From March 1, 2019 through January 1, 2022 Plaintiff was damaged by the City's ongoing policy, custom and practice of intentionally treating similarly situated Lumanair and subsequently Carver differently from Plaintiff as a result of the City issuing a new lease to Lumanair, later assigned to Carver with the approval of the City, with substantially more favorable terms and substantially lower costs to Lumanair compared to substantially greater costs to Plaintiff which allowed Lumanair and then Carver to sell avionics services at a significant discount which had to be matched by Plaintiff resulting in an estimated loss of approximately $120,972.

199.    All of the above, and other wrongful and discriminatory acts, constitute policies, customs and practices on the part of the City of Aurora by which the City knowingly and intentionally treated similarly situated Plaintiff differently from similarly situated Lumanair and

similarly situated Carver without any rational basis, although the City had multiple opportunities to correct the discriminatory aspects of its leases with Plaintiff and its comparators, and any claim of a rational basis on the part of the City would be pretextual.

200.    The disparate treatment of JA by Aurora in comparison to the treatment of Lumanair and Carver is in violation of the Fourteenth Amendment of the United States Constitution and Article I of the Constitution of the State of Illinois.

201.    Aurora's forgiveness of Bond payments owed by Lumanair, without any corresponding accommodation to Plaintiff, demonstrated Aurora's policy, custom and practice of discriminating against Plaintiff and caused and resulted in economic discrimination to Plaintiff (and all commercial tenants at the Aurora Airport) which has been substantial and a serious violation of the responsibility of the City of Aurora to protect its tenants from unreasonable and unfair competition, pursuant to Aurora's own Minimum Standards and paragraph 22. C. of the FAA Assurances. (*See* paragraphs 118 and 119 above.)

202.    Aurora's agreement allowing Lumanair and now Carver to continue using underground fuel storage tanks, while requiring Plaintiff to expend millions of dollars to meet the Minimum Standards including construction of an above ground fuel farm evidences Aurora's policy, custom and practice of discriminating against Plaintiff and caused and resulted in substantial economic discrimination against Plaintiff.

203.    Aurora agreement to allow Lumanair and now Carver to continue fuel storage and dispensing operations without purchasing environmental insurance as required of Plaintiff evidences Aurora's policy, custom and practice of discriminating against Plaintiff and caused and resulted in substantial economic discrimination against Plaintiff.

204.    Aurora agreement to allow Lumanair and now Carver to continue to continue to occupy hangars and office buildings without paying market comparable rent or rent equivalents similar to those charged to Plaintiff evidences Aurora's policy, custom and practice of discriminating against Plaintiff and caused and resulted in substantial economic discrimination against Plaintiff.

205.    Aurora's long term failure to stop Lumanair from Co-Oping fuel for many years, while prohibiting JA from doing the same, evidenced Aurora's policy, custom and practice of discriminating against Plaintiff and caused and resulted in substantial economic discrimination against Plaintiff.

206.    In the ways demonstrated above among others, and in Aurora's willful, knowing and intentional entry into lease agreements with Lumanair and with Carver on terms far more favorable to Lumanair and Carver than to similarly situated Plaintiff, Aurora has intentionally treated and continues to treat Plaintiff differently from similarly situated Lumanair and similarly situated Carver with no rational basis, and evidences Aurora's policy, custom and practice of discriminating against Plaintiff causing and resulting in substantial economic discrimination against Plaintiff, despite Aurora knowing of the disparate treatment and despite Aurora having had the authority and multiple opportunities to correct the disparities.

207.    Total damages sustained by Plaintiff as a result of disparate treatment by Aurora exceed $33,500,000.00, not including the loss of use of funds expended by Plaintiff to comply with the Minimum Standards.

208.    Aurora entered into  an Amended Lease with Plaintiff on April 22, 2015 (the "Amended Lease of 2015")  (**Exhibit No. 23**), in reference to the same leasehold interest subject to the 2007 Lease (**Exhibit No. 2**) which did not alter, amend or delete incorporation of the Minimum

Standards in the lease and the obligation of Plaintiff to comply with the Minimum Standards, and the obligation of the City, among others, to "protect its tenants from unreasonable or unfair competition" (Minimum Standards, **Exhibit 3**, page 2).

209. Plaintiff has complied with all the term of the Amended Lease of 2015.

210. Plaintiff's damages since entering into the Amended Lease of 2015, resulting from the continuous and ongoing disparate treatment by Aurora as herein described in regard to *inter alia* selective enforcement of the Minimum Standards and the agreement of Aurora to preferential lease terms favoring Lumanair and Carver, not including the loss of use of funds expended by Plaintiff to comply with the Minimum Standards, to which Lumanair and Carver have not been forced to comply, exceed $20,000,000.00.

WHEREFORE, Plaintiff, JOLIET AVIONICS, INC., an Illinois corporation, seeks judgment against Defendant, The City of Aurora, a municipal corporation, in an amount in excess of $20,000,000.00 and further seeks punitive damages and reimbursement from Defendant, The City of Aurora, a municipal corporation, of all attorney fees and costs expended in bringing this action.

<u>Count II</u>

<u>Breach of Contract</u>

211 – 421. Plaintiff adopts and reasserts paragraphs 1 – 210 of Count I as paragraph 211 – 421 of its Amended Complaint, as though fully set forth herein.

422. Aurora's Lease with Plaintiff of November 27, 2007 (**Exhibit No. 2**) and Aurora's Amended Lease with Plaintiff of 2015 (**Exhibit No. 23**) incorporated and required adherence and conformance with the Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport (the "Minimum Standards"). The 2006

Minimum Standards are attached hereto as **Exhibit No. 3**, and attached to Aurora's Fourth

Amended Verified Complaint (**Exhibit No. 16, hereto**) as Exhibit "B".

423.    Specifically, the subject lease between Aurora and Plaintiff provides as follows at

paragraph "13) b." on page 10:

> "b.  Local Ordinances
>
> This Lease shall be subject and subordinate to all ordinances of the City of
>
> Aurora, the Rules and Regulations of the Aurora Municipal Airport and/or
>
> the Minimum Standards for Commercial Activities at the Aurora Municipal
>
> Airport, as the same may be in effect and amended from time to time."

424.    The Minimum Standards warrant and provide, in relevant part, as follows:

> "For the privilege of operating on the Aurora Municipal Airport, fees will be
>
> charged as a provision of the agreement. The fee schedule, though dependent
>
> upon individual characteristics, shall be equitable with respect to the fees
>
> charged to other businesses on the field." (2006 Rules and Regulations
>
> Establishing Minimum Standards for Commercial Activities and Tenants at the
>
> Aurora Municipal Airport, first page, first paragraph **Exhibit No. 3**)

425.    The Minimum Standards further warrant and provide, in relevant part, as follows:

> "It is the responsibility of the City of Aurora to protect its tenants from
>
> unreasonable or unfair competition." (2006 Rules and Regulations Establishing

Minimum Standards for Commercial Activities and Tenants at the Aurora

Municipal Airport, second page, third full paragraph paragraph)

426.     The Minimum Standards further provide, in relevant part, as follows:

"Fuel farms shall be * * *  above ground storage tanks. (2006 Rules and

Regulations Establishing Minimum Standards for Commercial Activities and

Tenants at the Aurora Municipal Airport, third page, paragraph "2")"

427.     The Minimum Standards further provide, in relevant part, as follows:

"Security: The petitioner shall present to the City a plan, acceptable to the City,

that provides for the security of a bulk storage fuel farm. This plan shall include

perimeter controls, access and active monitoring of the fuel farm." (2006 Rules

and Regulations Establishing Minimum Standards for Commercial Activities and

Tenants at the Aurora Municipal Airport, fourth page, paragraph "9")"

428.     The Minimum Standards further provide, in relevant part, as follows:

"Co-Oping Fuel Farms: In accordance with FAA guidelines, no private or

corporate fuel farm may be co-oped with other entities. The petitioner shall

acknowledge and agree that the fuel farm will be solely used for their own aircraft

and that co-oping with other flight departments or individuals will not qualify

them to have their own fuel farm." (2006 Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, fourth page, paragraph "13")")

429.     The  Minimum Standards contain an Exhibit "A" which provides a list of the minimum equipment required in order to be allowed Retail Fuel Privileges at the Airport.

430.     Plaintiff has complied with all the terms of its leases with Aurora, both the 2007 Lease and the Amended Lease of 2015.

431.     Plaintiff has complied with all the Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport.

432.     In breach of its agreement with Plaintiff, while Aurora has enforced the Minimum Standards in regard to Plaintiff and although Plaintiff has complied with all Minimum Standards required of the City, Aurora has not enforced its own Minimum Standards in regard to similarly situated Fixed Base Operators, Lumanair and Carver.

433.     In breach of its agreement with Plaintiff, Aurora has not charged Plaintiff fees equitable with respect to the fees charged to other businesses on the field, and specifically has charged fees to Plaintiff far greater than the fees charged to Lumanair and Carver, without any rational basis for the significant difference in fees as recited hereinabove.

434.     In breach of its agreement with Plaintiff, Aurora has not complied in any reasonable manner with its responsibility to protect Plaintiff, its tenant, from unreasonable or unfair competition. To the contrary, Aurora has been a participant in drafting terms of leases for Plaintiff and for Lumanair and for Carver that are vastly unfair and which wrongfully

discriminate against Plaintiff and entirely fail to protect Plaintiff from unreasonable and unfair competition.

435.     Despite the mandates of Aurora's own Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, Aurora has failed to require Lumanair and Carver to install above-ground fuel storage tanks and will continue to fail to do so until at least 2024, 17 years after requiring Plaintiff to expend the funds to be in compliance with the Minimum Standards.

436.     Despite the mandates of Aurora's own Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, Aurora has failed to require Lumanair and Carver to provide perimeter controls to its underground fuel storage facility and its above ground apparatus for dispensing of fuel.

437.     Despite the mandates of Aurora's own Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport, Aurora failed for many years to prevent Lumanair from Co-Oping fuel with other businesses on the Airport.

438.     In these and many other ways outlined in Count I of this Amended Complaint, Aurora has breached its lease agreement with Plaintiff.

439.     All of the above breaches on the part of Aurora including those referenced in Count I above, adopted herein by reference, have damaged Plaintiff in an amount in excess of $20,000,000.00 since entering into the Amended Lease of 2015.

440.     At all relevant times, the City of Aurora had the authority and opportunity to correct the disparities referenced hereinabove and to protect its tenant from unreasonable or unfair competition and to insure Plaintiff was charged fees equitable with respect to the fees

52

charged to other similarly situated businesses at the Airport, but elected not to do so in breach of its lease agreement with Plaintiff.

WHEREFORE, Plaintiff, JOLIET AVIONICS, INC., an Illinois corporation, seeks judgment against Defendant, The City of Aurora, a municipal corporation, in an amount in excess of $20,000,000.00 and further asks that all costs of this action be taxed against The City of Aurora.

Respectfully submitted,

By: JOLIET AVIONICS, INC.,

/s/Thomas P. Scherschel
By: One of its attorneys

Thomas P. Scherschel
SmithAmundsen LLC
3815 East Main Street, Suite A-1
St. Charles, IL   60174
(630) 587-7912
Atty. No. 6184669
TScherschel@salawus.com