**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOLIET AVIONICS, INC., | |
| Plaintiff, | No. 19 C 8507 |
| v. | Judge Thomas M. Durkin |
| CITY OF AURORA, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Joliet Avionics, Inc. ("JA") brings class-of-one equal protection and breach of contract claims against the City of Aurora ("the City") in connection with its lease of airport space and operation at the Aurora Municipal Airport. Presently before the Court are the parties' cross motions for summary judgment. R. 166, 169. For the following reasons, JA's motion is denied and the City's motion is granted.

## Background

### I.    Local Rule 56.1

Before setting forth the background, the Court first addresses JA's compliance with Northern District of Illinois Local Rule 56.1.[1] The rule requires the moving party to provide a statement of material facts ("SOF") where "[e]ach asserted fact [is]

---

[1] Before this case was reassigned to the undersigned, Judge Maldonado denied JA's motion for leave to file an amended response to the City's SOF and JA's motion for reconsideration. R. 188, 195. To the extent that JA asks this Court to reconsider, that request is denied. *See Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) ("Generally speaking, a successor judge should not reconsider the decision of a transferor judge at the same hierarchical level of the judiciary when a case is transferred."); *see also Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997).

supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." N.D. Ill. L.R. 56.1(d)(2). The SOF "should not contain legal argument." N.D. Ill. L.R. 56.1(d)(4). The opposing party must then file a response, which sets forth the text of the asserted fact and admits, disputes, or partially admits or disputes each numbered paragraph of the SOF. N.D. Ill. L.R. 56.1(b)(2), (e). The response may not set forth any new facts or legal arguments except to make an objection. N.D. Ill. L.R. 56.1(e)(2). With any dispute, the response "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3).

The City first asks the Court to strike JA's noncompliant response and deem each asserted fact in the City's SOF admitted. JA's response to the City's SOF is deficient in several ways. JA omits the City's asserted facts, including only its responses. JA admits in part and disputes in part certain asserted facts without specifying which parts are disputed. In many cases, JA admits the substance of the City's asserted fact but includes argument, adds new facts, or disputes facts that are not mentioned by the City. Most critically, the large majority of JA's disputes lack proper citations to evidentiary material. True, five responses properly cite to the City's exhibits but others cite to JA's opposition brief or its own statement of facts, and many have no citation whatsoever. Accordingly, all asserted facts in the City's

SOF except paragraphs 26, 27, 28, and 52 are deemed admitted to the extent they are supported by the record. N.D. Ill. L.R. 56.1(e)(3). Further, as motions to strike Rule 56.1 responses are disfavored, *see* N.D. Ill. L.R. 56.1(e)(2), the Court declines to strike any portion of JA's response, but the Court will not consider additional facts set forth in that response or legal argument beyond the stated objections.

The City also asks the Court to strike and disregard certain statements in JA's SOF and memorandum in support of summary judgment as noncompliant. For the reasons stated, the Court declines to strike any part of JA's memorandum or SOF. The Court is capable of distinguishing between argument and fact, and insofar as JA refers to facts in its memorandum that are not found in its SOF or includes legal arguments in its SOF, the Court will not consider them. *See* N.D. Ill. L.R. 56.1(d)(4), (g).

II.     Overview of Relevant Facts

The City is the owner and sponsor of the Aurora Municipal Airport ("the Airport") in Sugar Grove, Illinois. Def.'s Stmt. of Facts ("DSOF") ¶ 1.[2] An airport sponsor is a public agency or private owner of a public-use airport that applies for financial assistance from the Federal Aviation Administration ("FAA").[3] Airport sponsors like the City grant commercial businesses called fixed-base operators, or

---

[2] To avoid cumulative citations, where facts are included in both JA's statement of facts ("PSOF") and the City's statement of facts ("DSOF"), the Court cites only the latter.

[3] The Court relies on FAA materials to define key terms. *E.g.*, FAA, Advisory Circular, Minimum Standards for Commercial Aeronautical Activities (August 2006) https://www.faa.gov/documentlibrary/media/advisory_circular/150-5190-7/150_5190_7.pdf, at 13 ("FAA Advisory Circular").

FBOs, the right to operate at an airport and provide aeronautical services such as such as flight training, aircraft and avionics installation and repair, aircraft rental, charter services and fueling. FAA Advisory Circular at 13.

The City sets forth the base-level requirements for FBOs to operate at the Airport in the Rules and Regulations Establishing Minimum Standards for Commercial Activities and Tenants at the Aurora Municipal Airport ("Minimum Standards"). DSOF ¶ 65. The Minimum Standards, as amended in 2006, provide that all commercial activity must be performed according to a lease with the City. *See* R. 171-10 at 1. They state, in part, that "[i]t is the responsibility of the City of Aurora to protect its tenants from unreasonable or unfair competition." DSOF ¶ 67. The Minimum Standards also include requirements related to fuel storage tanks ("fuel farms"), such as that fuel farms "shall . . . be aboveground storage tanks,"[4] and that "evidence of a $15,000,000 environmental and liability insurance policy shall be presented" with the application to install and operate a fuel farm. *Id.* ¶¶ 66, 68, 69; PSOF ¶ 56.

Additionally, the City, as a sponsor and recipient of certain federal grants, must adhere to certain Grant Assurances. PSOF ¶ 4. One of those Grant Assurances, Grant Assurance No. 22, provides in relevant part that each FBO at the Airport "shall

---

[4] The City appears to argue that notwithstanding the use of "shall," the Minimum Standards do not require fuel farms to be aboveground. *See, e.g.*, R. 178 at 10 ("[T]he Minimum Standards merely provide that fuel farms 'shall' be aboveground, not that they must be aboveground."). The Court does not see the distinction the City seeks to draw. The Seventh Circuit has "consistently interpreted 'shall' as mandatory language." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 865 (7th Cir. 2020) (citing cases).

be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other [FBOs] making the same or similar uses of such airport and utilizing the same or similar facilities." *Id.*

JA is an FBO that conducts business at the Airport pursuant to a November 27, 2007 lease with the City and an April 22, 2015 amendment to the lease. DSOF ¶ 2. When JA began operating at the Airport, the City had existing leases with Lumanair, Inc. ("Lumanair"), another FBO that had been operating at the Airport since 1966. *Id.* ¶ 4. On August 1, 2020, the City and Lumanair entered into an amended lease. *Id.* ¶¶ 5, 37. That lease was assigned to Carver Aero ("Carver") on July 27, 2021, after Carver purchased Lumanair. *Id.* On January 1, 2022, the City and Carver entered into a new lease. *Id.* ¶ 5. The leases are summarized in relevant part in the subsections that follow.

III.    JA's Leases

On November 27, 2007, JA freely entered a lease with the City that was negotiated between the parties through their respective counsel. *Id.* ¶ 8. Under the lease, JA leased three hangars, the underlying real estate, and a parcel of land on which it would construct and use a fuel farm. *Id.* ¶ 9. The lease also provided that JA would negotiate to acquire the BP Hangar and transfer it to the City, which would lease it back to JA along with an option for JA to lease both parcels of land next to the BP Hangar. *Id.* ¶ 10. To finance the construction of the fuel farm, complete

5

renovations of the hangars, and acquire the BP Hangar,[5] the City agreed to issue or facilitate up to $10 million in tax-exempt special facility revenue bonds or equivalent bonds and allow JA to make the principal and interest payments on the bonds in lieu of rent. *Id.* ¶ 11. The City was unable to obtain a general obligation bond. *Id.* ¶ 49. The lease further provided that JA would pay rent of 1.5% of gross receipts, subject to certain exclusions, and would meet all Minimum Standards by January 1, 2009. *Id.* ¶¶ 12, 13. The lease term was 20 years with an option for JA to renew for two five-year periods. R. 171-2 at 3.

In 2015, the City and JA amended the 2007 lease to resolve JA's non-payment of certain rent and fees owed to the City in excess of $500,000. DSOF ¶¶ 18, 22. The amended lease relieved JA's obligation to pay approximately $456,701, and JA agreed to pay the remainder. *Id.* ¶¶ 19–21. JA released and discharged the City from "any and all actions, notices, claims, orders, summonses, citations, directives, litigation, investigations or proceedings of any kind and nature that [JA or its affiliates] have against [the City] arising from, relating to, or in any way connected with" the 2007 lease and the Minimum Standards. *Id.* ¶ 23. The amended lease also extended the lease term from 20 to 25 years with an option for JA to renew for two five-year periods. R. 171-3 at 4.

IV.    Lumanair's Leases

---

[5] JA claims it was required under the 2007 lease to acquire the BP Hangar at a cost of approximately $4 million. *See, e.g.*, R. 174 at 19; R. 176 ¶ 5. The $4 million figure does not appear in the 2007 lease or in any of the cited evidence. The Court found some evidence that JA paid $4 million, *see* R. 171-19 at 140, but no evidence of a specific monetary commitment in the 2007 lease.

Lumanair entered two separate leases for real estate at the Airport in 1982 and 1999. DSOF ¶ 24. The 1999 lease was for a term of 20 years, with an option to renew for another 10 years. PSOF ¶ 21. Those leases provided that "[a]t the termination of this lease or of any extensions or renewal thereof, [Lumanair] shall surrender the leased premises, including all buildings and site improvements" constructed or installed by Lumanair, at which time they "shall" become the sole property of the City. DSOF ¶ 25. Additionally, a 1992 operating agreement provided that Lumanair would operate and manage three hangars on the City's behalf. *Id.* ¶ 28. Lumanair would pay ground rent and all other costs and expenses of the project, including the principal and interest on a $4.295 million general obligation bond to be issued by the City to finance airport improvements under the Lumanair agreements. PSOF ¶¶ 59–61, 63. The City terminated the operating agreement in order to lease the three hangars to JA pursuant to the 2007 lease, at which point Lumanair was not required to pay the $5.76 million balance on the bond. *Id.* ¶ 65; DSOF ¶¶ 28, 53.

Prior to doing business at the Airport, JA understood that Lumanair was "grandfathered in" to the 2006 Minimum Standards, such that Lumanair did not have to comply with the amended terms unless its lease was amended or renewed. DSOF ¶¶ 74, 75. In 2014, the City told Lumanair it was required to bring its fuel farm above ground within a certain period of time and sent several eviction notices between 2015 and 2018 in an attempt to enforce the amended Minimum Standards. *Id.* ¶ 77; PSOF ¶ 19; R. 168-1 at 145–156, 168-2 at 1–76. Around that time, Lumanair filed a complaint against the City with the FAA. R. 168-3 at 157. The FAA recommended

that the City try to work it out with Lumanair rather than terminating the lease and evicting them. *Id.*; DSOF ¶ 55. Following the expiration of the 1982 and 1999 leases in February 2019, and while the City and Lumanair were in active litigation, Lumanair continued operating at the Airport and retained ownership and possession of its hangars and office space. PSOF ¶ 23. During that time, JA offered to the City that it would lease Lumanair's hangars and office space for $8.50 per square foot, but the City declined. *Id.* ¶ 70.

On August 1, 2020, the City and Lumanair entered into an amended and restated lease for a five-year term with five options to renew for five years, not to extend beyond 2050. DSOF ¶ 29; R. 176-2 at 91. The lease waived ground rent for the first five years and, if renewed, another two years. DSOF ¶ 30. Lumanair agreed to pay an additional rent of 1.5% of gross receipts, subject to certain exclusions. *Id.* ¶ 31. Specifically, Lumanair had to undertake at least $1.2 million in capital improvements and, by August 1, 2022, complete the installation of the fuel farm and meet all Minimum Standards as outlined by the lease. *Id.* ¶ 36. Additionally, the lease provided that Lumanair would enter into an environmental indemnity agreement with the City in lieu of any environmental insurance required by the Minimum Standards. *Id.* ¶ 35. Lumanair never installed an aboveground fuel farm. PSOF ¶ 32.

V.     Carver

In 2021, Carver purchased Lumanair for $4 million, and the City approved the assignment of the 2020 lease to Carver. DSOF ¶ 37. On January 1, 2022, the City and Carver entered into a new lease, which abates ground rent for the first 20 years,

subject to a construction and capital improvement rider. *Id.* ¶ 38. The rider provides that Carver will install a fuel farm and meet all Minimum Standards by July 1, 2024[6] and invest at least $10 million in the premises, including at least $3 million before January 1, 2027, $3 million before January 1, 2032, and $4 million in each of the two following years. *Id.* ¶¶ 40, 41, 43. If Carver does not meet these deadlines, it must begin paying ground rent, at an amount disputed between the parties. *Id.* ¶¶ 44, 45. Carver may satisfy $4 million of the amount remaining in years six through twelve by procuring new tenancies or ownership of facilities at the Airport. PSOF ¶ 43; R. 176 at 165. Carver must also pay an additional rent of 1.5% of gross receipts, subject to certain exclusions, and enter into an environmental indemnity agreement with the City in lieu of any environmental insurance required by the Minimum Standards. DSOF ¶¶ 39, 42. The lease is for a five-year term with five options to renew for five years, with the fourth and fifth options conditioned on the completion of the agreed capital improvements or payment of equivalent rent. R. 176-2 at 147.

## VI. The Present Suit

JA brings two claims against the City: (1) class-of-one discrimination pursuant to 42 U.S.C. § 1983, and (2) breach of contract. The parties filed cross-motions for summary judgment on both claims.

---

[6] At oral argument on September 9, 2024, the City represented that Carver has not yet built the aboveground fuel farm and is awaiting FAA approval to place the fuel farm at the proposed site.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Discussion**

I.    Scope of the Claims

As a preliminary matter, JA's claims cannot arise out of any events before April 22, 2015. That is the day that JA expressly released and discharged the City from any and all claims "arising from, relating to, or in any way connected with the [2007] Lease and/or the [Minimum Standards]." DSOF ¶ 23. As such, JA cannot sustain a claim that is premised on any differences between the terms in its 2007 lease and the

terms in Lumanair's 1982 and 1999 leases, or any conduct by the City related to the enforcement of the Minimum Standards as to JA and Lumanair that occurred prior to April 22, 2015. JA's equal protection and breach of contract claims must therefore arise from any differences between the terms of its 2007 lease and the terms of Lumanair's 2020 lease and Carver's 2022 lease, and the City's enforcement of the Minimum Standards after April 22, 2015.

II.     Class-of-One Claim

JA brings a class-of-one discrimination claim under the Equal Protection Clause of the Fourteenth Amendment. A class-of-one claim alleges that a defendant "intentionally treated [the plaintiff] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, JA claims that it received less favorable lease terms, including terms that required faster and stricter adherence to the Minimum Standards. JA focuses on the different rent structures, financing terms, expenditure and capital improvement requirements, term extensions, environmental insurance requirements, and the time allowed for complying with the aboveground fuel farm. *See generally* R. 167 at 5–7, 12; R. 174 at 15–21. According to JA, as a result of these differences, JA has been forced to pay more to operate at the Airport than its competitors.

The City contends that JA's class-of-one claim fails for two reasons. First, the class-of-one theory is inapplicable because JA's claim is premised on its contractual relationship with the City, not the City's exercise of regulatory authority. Second,

even if it is a viable theory, JA's class-of-one claim fails on the merits because JA, Lumanair, and Carver are not similarly situated and there are rational bases for any differences between the lease terms and enforcement of the Minimum Standards. The Court addresses each argument in turn.

### A. Theory

The City initially argues that the class-of-one theory is inapplicable to this circumstance. In *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008), the Supreme Court held that public employees cannot maintain class-of-one claims against their employers. Although *Engquist* limited its holding to the employment context, its reasoning suggested a broader application. The Supreme Court explained that the class-of-one theory is a poor fit for state actions that, by their nature, involve "discretionary decisionmaking based on a vast array of subjective, individualized assessments" because "[i]n such cases, treating like individuals differently is an accepted consequence of the discretion granted to governmental officials." *Id.* at 603. The theory is "better suited to those contexts involving 'a clear standard against which departures, even for a single [individual], could be readily assessed.'" *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008) (quoting *Engquist*, 553 U.S. at 602) (citing *Olech*, 528 U.S. at 564–65 (challenge to zoning board's departure from standard easement length requirement); *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U.S. 336, 339–42 (1989) (challenge to county's departure from market-value standard in conducting some property assessments)).

On this basis, courts have found the class-of-one theory inapplicable in cases challenging state action in selecting contractors. *E.g.*, *Douglas Asphalt Co. v. Qore*,

*Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (company alleged it was wrongfully singled out during the application process for a new construction bid); *Intralot, Inc. v. McCaffrey*, No. 1:11-cv-08046, 2012 WL 4361451, at *5 (N.D. Ill. Sept. 21, 2012) (company alleged unfair treatment in the selection process for a private manager of the state lottery). In those cases, the courts recognized that the contractor hiring schemes "contemplate[d] exactly the kind of subjective and discretionary governmental decision-making . . . that *Engquist* held cannot be attacked through a class-of-one equal protection claim." *Intralot*, 2012 WL 4361451, at *5 (discussing *Douglas*).

So too here. The City's lease negotiations with FBOs necessarily involve discretionary and individualized decisions. The choice of certain lease terms over others depends on numerous factors, including but not limited to the size and condition of the premises to be leased, the availability of financing, the type of business the FBO wants to engage in at the Airport, the needs of the Airport, and how the City might make the best use of its asset at a given point in time. Moreover, if a core feature of a class-of-one claim is "treatment departing from some norm or common practice," *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012), it is difficult to see how the terms reached with one FBO (Lumanair and then Carver) at one point in time for a particular leasehold constitute a clear standard, against which the terms reached with JA at a different point in time for a different leasehold can be readily assessed.

JA argues that while the decision to grant JA, Lumanair, and Carver leases—like the selection of contractors in *Douglas* and *Intralot*—may have been an exercise of discretionary authority, the choice of lease terms was not. JA does not explain, nor does this Court see, how that is the case. In fact, the choice of terms in a particular lease involves far more discretion and individualized considerations than the decision to engage in lease negotiations with an FBO at all. In other words, reaching different lease terms with different FBOs is "an accepted consequence of the discretion granted" to the City to enter into leases with FBOs for particular premises at the Airport. *Engquist*, 553 U.S. at 603.

JA also contends that courts have consistently held that municipal operators of airports are subject to class-of-one claims. Yet, of the three non-binding cases JA points to in support, only one involved a § 1983 claim. *See Gary Jet Ctr. Inc. v. Gary/Chicago Int'l Airport Auth.*, No. 2:13-CV-453 JVB, 2014 WL 1329412, at *1 (N.D. Ind. Apr. 2, 2014) (denying motion to dismiss class-of-one claim brought by FBO against airport authority for selectively enforcing regulations). Further, *Gary Jet* did not analyze whether, as a threshold issue, the class-of-one theory was applicable and made no reference to *Engquist* whatsoever. Because the City's decision to reach certain lease terms with specific FBOs was, by its nature, discretionary, summary judgment must be granted for the City on JA's equal protection claim.

B.    Merits

Even if the class-of-one theory applied, JA's claim would still fail. "Class-of-one claimants carry a heavy burden." *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 588 (7th Cir. 2021). To support its class-of-one claim, JA "must show it was intentionally

treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* To satisfy the "similarly situated" prong, JA and its comparators must be "*prima facie* identical in all relevant respects or directly comparable in all material respects." *Id.* "Whether the entities are similarly situated is a factual question, but summary judgment is appropriate where no reasonable factfinder could find the requirement is met." *Id.* To satisfy the "rational basis" prong, JA must "negat[e] any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citing *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015)). This requirement "sets the legal bar low and simply requires a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (quoting *D.B. ex rel. Kurtis v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). The benign justification need not be the actual justification, just a conceivable one. *Kopp*, 725 F.3d at 686.

### 1.    Similarly Situated

At the start, no reasonable factfinder could find that JA was similarly situated to Lumanair or Carver. It is true that all three entities are or were FBOs at the same airport, and there is evidence that they offer similar services. But that does not mean they are "directly comparable in all *material* respects." *FKFJ*, 11 F.4th at 588 (emphasis added). JA's complaint boils down to a claim that Lumanair and Carver received more favorable lease terms, which reflected uneven enforcement of the Minimum Standards. But here, the parties separately negotiated and entered into their leases years apart. When JA entered into its lease with the City in 2007,

Lumanair had already been operating at the Airport for decades pursuant to the 1982 and 1999 leases. The City and JA amended the 2007 lease in 2015, and after the expiration of Lumanair's 1999 lease in 2019, the City and Lumanair entered into an amended lease in 2020, which was assigned to Carver the following year. Finally, in 2022, the City entered into a new lease with Carver. *See Sellars v. City of Gary*, 453 F.3d 848, 851 (7th Cir. 2006) (retired firefighter was not similarly situated to firefighters who retired seven years after him); *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 454-55 (7th Cir. 2002) (Purzes were not similarly situated to individuals who submitted different variances than the Purzes requested, submitted their plats during different time periods, or had requests granted by different and previous Boards).

JA argues that the passage of time is not enough to render the FBOs materially dissimilar. But here, at those different points in time, the parties were negotiating leases for leaseholds that differed in size, amenities, and condition. For example, when JA arrived at the Airport, there was no fuel farm available for it to use. As such, if JA wanted to sell fuel, it would have to install a new fuel farm. The Minimum Standards in effect at that time required new fuel farms to be above ground. That meant that JA would have to incur the cost of installing a new aboveground fuel farm. By comparison, when Lumanair entered its leases with the City, there was no requirement that fuel farms be aboveground. In 2007, Lumanair was "grandfathered in" such that it did not have to comply with the new Minimum Standards until the termination or renewal of its leases in February 2019 and could continue using its

existing underground fuel farm. Even so, as of 2015, the City was engaged in litigation to bring Lumanair into compliance with the aboveground fuel farm standard, and the 2020 and 2022 leases set forth timelines for compliance, in addition to other capital improvements. Additionally, whereas Lumanair constructed the buildings that it (and subsequently Carver) owned and occupied, JA did not construct and does not own the buildings it occupies. *See Chicago Studio Rental, Inc. v. Illinois Dep't of Com.,* 940 F.3d 971, 975 (7th Cir. 2019) (competitor studios were not similarly situated where defendant had more stages and floor space and charged production companies lower fees); *Paramount Media Grp., Inc. v. Village of Bellwood*, 929 F.3d 914, 920 (7th Cir. 2019) (competitor media companies were not similarly situated because they made different offers to lease land from Village).

JA adds that one would reasonably expect a lease entered into in 2020 or 2022 to cost more, not less, than a lease entered into in 2015 or 2007. R. 174 at 13. But these are not simple contracts for the sale of the exact same goods. These are leases for different parcels of land with different facilities and different financing and use considerations. On that basis, no reasonable factfinder could conclude that JA was similarly situated to Lumanair and Carver.[7]

---

[7] On September 9, 2022, JA filed a Part 13.2 Complaint with the FAA alleging that the City granted Carver access to the Airport on more favorable terms than JA. *See* R. 193 at 2. On August 4, 2023, the FAA provided a preliminary ruling that JA and Carver were not "similarly situated," such that the City was not required to enter into identical leases. *Id*. at 3. The Court granted the City's motion to supplement the record with the FAA's preliminary ruling, and denied JA's related motion to strike. R. 204. However, this Court would conclude that the FBOs are not "similarly situated," as that term is understood by the Seventh Circuit, regardless of the FAA's preliminary ruling.

2.    Rational Basis

Further, even if the entities were similarly situated, there are rational bases for the varied lease terms. JA focuses on the parties' respective obligations to pay for the use of and make improvements to their respective premises, the financing and debt forgiveness each received, the amount of time the parties had to install aboveground fuel farms, the need to procure environmental insurance, and the lease durations. But by viewing each difference in a vacuum, JA misses the forest for the trees. Each of those terms is part of a larger lease, which was separately and voluntarily negotiated by the parties. As stated, those leases were negotiated at different times, with different Airport conditions and available financing, and for different spaces and types of leaseholds, all against the backdrop of the City's responsibility to make the best use of and improve its asset at any given point in time. The City itself had its own differing financial circumstances and goals at the time of each lease negotiation. Those circumstances supply the rational bases for each of the differences JA identifies.

JA first takes issue with the fact that a 1992 agreement provided Lumanair with a $4.92 million general obligation bond to finance the procurement of the three hangars, and, in 2007, the City forgave the $5.76 million balance on the bond. JA argues that it received "no such financing or debt forgiveness" from the City. R. 167 at 6; *see also* R. 174 at 21. As an initial matter, it is not clear that JA's claim can arise from these events, which were well before April 2015. But even if it could, there was no general obligation bond available when JA negotiated its lease fifteen years later

18

after the 1992 agreement. JA agreed to the type of bond that was available. Additionally, in making the three hangars available for JA, Lumanair was no longer using them. It rationally follows that the City would not require Lumanair to continue paying on a bond for space they no longer had the ability to use. Moreover, JA continues the use the space for which it makes debt payments, and the City forgave approximately $456,701 in outstanding rent and fees owed in amending the lease with JA in 2015.

JA next challenges the amount of time each FBO had to build an aboveground fuel farm. JA argues that while it had to build the fuel farm just over a year after arriving at the Airport, Lumanair received thirteen more years to do so, and then Carver received another two years to do so. R. 167 at 5; R. 174 at 19. There are several flaws with this argument. At the start, the City did not arbitrarily require JA to build the fuel farm in a certain time frame. JA negotiated this term in its lease with the assistance of counsel. There is no evidence that JA ever asked, as a part of its negotiations with the City, that it be given more time or that Lumanair be required to build an aboveground fuel farm on any timeline. Further, as discussed in detail above, JA had to install an aboveground fuel farm in order to sell fuel, whereas Lumanair could use its existing underground fuel farm because it was "grandfathered" into the Minimum Standards. What's more, as of 2015, years before Lumanair's leases expired, the City was trying to force Lumanair to install the aboveground fuel farm. That Lumanair refused, litigation ensued, the parties ultimately reached a new agreement in August 2020, and that the City negotiated

with a new party—Carver—after its acquisition of Lumanair, all serve as rational bases for the different construction timelines.

JA points to other differences in the capital improvement terms too. JA contends that the City required it to pay $9.4 million up front to build the fuel farm, improve the hangars, and acquire the BP Hangar to convey back to the City. In contrast, according to JA, the City allowed Carver the option to pay $10 million for capital improvements over twelve years, with the ability to satisfy $4 million through procuring another tenant[8] and without any obligation to purchase an asset to be deeded back to the City, or alternatively pay less than $50,000 per year in ground rent. R. 167 at 5, 6; R. 174 at 19. Whereas the $9.4 million figure is not found anywhere in the 2007 lease, Carver agreed to the specific $10 million commitment. More generally, these terms are not the City's requirements or grants of permission, they are the terms that the parties agreed to in their separate negotiations fifteen years apart. The terms rationally follow from the circumstances at each point in time, including the City's interest in maintaining and improving its assets based on their respective conditions. The Court has already discussed that when JA arrived at the Airport, it needed to build an aboveground fuel farm in order to sell fuel and received financing assistance to complete the stated improvements. By comparison, when Carver arrived at the Airport, it had just spent $4 million to acquire Lumanair and

---

[8] JA argues that this term was intended to help Carver buy out JA and becoming the sole FBO at the Airport. *See, e.g.*, R. 181 at 25. There is no evidence that the City acted to help Carver acquire JA. That Carver may have wanted to acquire or considered acquiring JA is not evidence that the City tried to facilitate that outcome through agreeing to certain lease terms.

there is no evidence that Carver received any such assistance for its pledged $10 million in capital improvements. Additionally, JA points to no evidence that it asked for any term akin to the $4 million satisfaction through acquisition or asked to own the BP Hangar in the course of its negotiations.

Relatedly, JA raises the difference in the amount each FBO has paid to operate at the Airport. JA contends that between 2015 and 2024, it was required to pay approximately $500,000 per year to operate at the Airport, while Lumanair only had to pay approximately $41,000 per year until August 2020, and Lumanair and Carver had to pay $0 thereafter. R. 167 at 5–7; R. 174 at 16, 20. But those dollar figures are found nowhere in the leases. In fact, the 2020 lease provided that Lumanair would pay monthly rent in the amount of 1.5% of gross receipts from business generated at the Airport and monthly fuel flowage fees, the 2022 lease provides that Carver will do the same. In actuality, JA is comparing the amount that it has paid as a result of its agreement to pay the principal and interest on the bond in lieu of rent with the amount that its expert estimates Lumanair paid as a result of its agreement to pay ground rent until 2020 and abate ground rent in the 2020 and 2022 leases. Those terms are not conducive to an apples-to-apples comparison. Whatever amounts each FBO paid on a monthly or annual basis directly flow from the leases negotiated by each party, not from the City's arbitrary enforcement of specific monetary commitments.

JA also argues that there was no rational basis for the City to decline its $8.50 per square foot offer for the spaces occupied by Lumanair and instead agree to an

21

amended lease with Lumanair and then Carver, wherein Lumanair and Carver would be able to continue owning and using the same space at no charge. R. 167 at 6, 7, 11; R. 174 at 20. But in the midst of litigation, the City followed the FAA's recommendation that it work things out with Lumanair rather than pursuing termination and eviction. And, although the amended lease did not require Lumanair to pay any occupancy charge, it did provide that Lumanair would make $1.2 million in capital improvements, build the aboveground fuel farm within two years, and pay an additional rent of 1.5% gross receipts. Carver's lease had similar terms and a significantly higher capital improvement commitment. The City had a legitimate interest in securing these improvements given the current state of the premises and maintaining multiple FBOs at the Airport. All of this forms a rational basis for the City's decision to amend the lease rather than accept JA's offer and terminate Lumanair.

JA's argument about the lease durations is likewise unavailing. JA contends that Lumanair and Carver were allowed to extend their leases to 2050 and 2051, but JA was not permitted to extend its lease. R. 167 at 6; R. 174 at 20. That is inaccurate. The 2020 Lumanair lease provided for a five-year term with five options to renew. None of those options was ever exercised because the lease was assigned to Carver and then Carver signed the new lease in 2022. Carver's lease provides for a five-year term with five options to renew for five years, with the fourth and fifth options conditioned on the completion of the agreed capital improvements or payment of equivalent rent. In other words, Carver's lease provides for a 20-year term with a

conditional option to renew for another ten years. JA's 2015 amendment extended its term from 20 to 25 years with two unconditional options to renew for five years. Any difference in dates is rationally explained by the different times the leases were entered into.

JA also claims that while it had to purchase environmental insurance as required by the Minimum Standards, Lumanair and Carver were allowed to enter environmental indemnity agreements instead. R. 167 at 5; R. 174 at 19, 22. JA's argument is inconsistent with the record in a number of ways. To begin, the Minimum Standards require FBOs to submit proof of a $15 million environmental and liability insurance policy with any application to install a fuel farm. Yet the record indicates JA had a $5 million insurance policy and entered into an environmental indemnity agreement in 2008 in lieu of site assessments required by the Minimum Standards. *See* R. 168-3 at 130, 171-2 at 9, 20–33. By comparison, while there is no evidence that Lumanair had a pending application for a fuel farm, as of 2015, the City was trying to compel Lumanair to procure insurance. Lumanair complained to the FAA that JA was permitted to enter an environmental indemnity agreement while Lumanair's decades-old leases did not permit the same. *See* R. 168-3 at 130. Following that litigation, the City entered into the 2020 lease with Lumanair and then the 2022 lease with Carver. Each of those leases provides for a $4 million liability policy and an environmental indemnity agreement in lieu of any environmental insurance required by the Minimum Standards, but require site assessments as provided by any agreement and Pollution Legal Liability insurance in the amount of $2 million.

R. 171-7 at 9, 11, 171-9 at 9, 11. In short, there are rational bases for any differences related to environmental insurance.

JA lastly argues that the City required it to install an elevator in its two-story building to comply with building codes, but did not require the same from Lumanair and Carver. R. 167 at 5; R. 174 at 18–19. The support for this argument is limited to JA's president's testimony that JA had to install an elevator in its two-story building and that Lumanair and Carver's two-story building or buildings do not have elevators. PSOF ¶ 75. There is no citation to any building code and no detail around when, how, or why JA installed the elevator and Lumanair and Carver did not. Without more, JA cannot show there was no rational basis for any difference in treatment.

### 3. Animus

The question of what, if any, showing of animus a plaintiff must make to establish a class-of-one claim remains unsettled. *Baliga v. Smith*, No. 23-1786, 2024 WL 511877, at *4 (7th Cir. Feb. 9, 2024). The Seventh Circuit explained:

> The crux of the disagreement [is] whether the plaintiff in a class-of-one claim must demonstrate only that there is no possible justification or rational basis for the defendant's actions, or if the plaintiff must demonstrate a lack of justification and also present evidence of hostile intent or animus, or if the plaintiff must demonstrate an absence of rational basis, which can be satisfied with evidence of animus.

*Id.* (citing *Brunson v. Murray*, 843 F.3d 698, 704 (7th Cir. 2016)) (cleaned up). Because JA does not attempt to show animus, whichever standard applies, JA cannot succeed.

In summary, the Court finds that no reasonable factfinder could conclude that JA, Lumanair, and Carver were similarly situated because they freely and voluntarily negotiated leases years apart for different leaseholds with different amenities and conditions. Even if the FBOs were similarly situated, no reasonable factfinder could find a lack of rational basis for any differences between the lease terms or the enforcement of the Minimum Standards. Accordingly, the Court grants summary judgment for the City on JA's class-of-one claim.[9]

III.    Breach of Contract Claim

JA claims that the City breached the 2015 amended lease. To succeed on a breach of contract claim, JA must establish (1) a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) a resulting injury. *Gonzalzles v. Am. Express Credit Corp.*, 315 Ill. App. 3d 199, 206 (2000). JA asserts that the City breached its lease with JA by failing to abide by the Minimum Standards and Grant Assurance No. 22. The Minimum Standards state that "[i]t is the responsibility of the City of Aurora to protect its tenants from unreasonable or unfair competition." PSOF ¶ 9. Grant Assurance No. 22 provides that "[e]ach [FBO] at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other [FBOs] making the same or similar uses of such airport and utilizing the same or similar facilities." *Id.* ¶ 4.

---

[9] Because there is no constitutional violation, the Court need not address *Monell* liability.

It is undisputed that the Minimum Standards and Grant Assurances are not contracts between JA and the City. But JA contends they are part of the 2007 lease by virtue of Section 13, which states in relevant part, "This Lease is subject to all applicable State and Federal laws as well as all articles and conditions of grant agreements entered into between the [City] and the [FAA]," and "shall be subject and subordinate to" the Minimum Standards "as the same may be in effect and amended from time to time." *Id.* ¶ 8.[10] The City disagrees that Section 13 gives the Minimum Standards and the Grant Assurances contractual force.

"The basic rules of contract interpretation under Illinois law are well settled." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689–90 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 2621 (2018) (citing *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (Ill. 2007)).

> In construing a contract, the primary objective is to give effect to the intention of the parties. A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent. A contract must be construed as a whole, viewing each provision in light of the other provisions. If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning. However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent.

---

[10] JA's 2015 amended lease released and discharged the City from all claims related to the 2007 lease and the Minimum Standards. So, any breach of contract claim must be limited to a breach of the 2015 lease. The 2015 lease does not have language akin to Section 13. But because the 2015 lease provides that "[e]xcept as expressly set forth in this First Amendment, the [2007] Lease is otherwise unmodified and remains in full force and effect," R. 176-1 at 4, the Court considers Section 13 of the 2007 lease to remain in effect following the 2015 amendment.

*Id.* Relatedly, "a document is incorporated by reference into the parties' contract only if the parties intended its incorporation." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). The intent to incorporate must "be clear and specific." *Id.* As such, courts applying Illinois law have concluded that the "[m]ere reference to another contract or document is not sufficient to incorporate its terms into a contract." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 666 (7th Cir. 2002); *see also Components for Indus., & Others, Inc. v. Auto Kabel N. Am., Inc.*, No. 19-CV-7152, 2020 WL 4505878, at *3 (N.D. Ill. Aug. 5, 2020) (citing cases).

In this case, Section 13 does not show a clear and specific intent to turn each and every one of the party's obligations under the Minimum Standards and Grant Assurances into terms of the contract. "Subject to" is not defined in the 2007 lease. But under prevailing Illinois case law, the words "subject to," used in their ordinary sense, mean "subordinate to, subservient to, or limited by." *Englestein v. Mintz*, 345 Ill. 48, 61 (1931). They do not create new contractual rights. *Id.* ("There is nothing in the use of the words 'subject to,' in their ordinary use, which would even hint at the creation of affirmative rights."); *see also Schek v. Chicago Transit Authority*, 91 Ill. App. 2d 71, 80 (1st Dist. 1968), *rev'd on other grounds*, 42 Ill. 2d 362 (1969) (language providing that agreement between plaintiff and the union "shall be subject and subordinate to" the agreement between the defendant and the union did not mean plaintiff assumed obligation present in latter agreement).

Likewise, by making the lease "subject to" federal and state law, the Minimum Standards, and the City's grant agreements, Section 13 provides that the lease is

27

"subordinate to, subservient to, or limited by" those sources. *Englestein*, 345 Ill. at 61. Indeed, Section 13 is titled "subordination," and states the "*lease*" is "subject to" the Minimum Standards and Grant Assurances—not the parties, JA, or the City. In this way, the words "subject to" direct how the *existing* terms in the lease should be interpreted. Insofar as the lease could be read to require a party to do something that the Minimum Standards or Grant Assurances prohibit it from doing (or to prohibit a party from doing something that those sources require it to do), Section 13 clarifies that the Minimum Standards and Grant Assurances in that limited circumstance control. Section 13 does not indicate a clear and specific intent to adopt each and every one of the parties' duties under the Minimum Standards and Grant Assurances as additional contractual obligations. Put differently, Section 13 operates to limit the JA and the City's respective duties under the lease, not to create new ones.

JA insists that Section 13 unambiguously means that the parties' obligations under the lease include their obligations under the Minimum Standards and the Grant Assurances. Yet JA does not offer any dictionary or other definition for "subject to." JA does not attempt to distinguish *Englestein* or *Schek* or cite to any case where the words "subject to" were understood to indicate incorporation by reference or the inclusion of additional contractual obligations. Nor does JA identify any other language in the 2007 lease that supports such an understanding. Instead, JA points to the City's 2014-2018 litigation with Lumanair, wherein the City claimed that Lumanair breached its 1982 and 1999 leases by violating the Minimum Standards. Those Lumanair leases contain language identical to Section 13. But the Court does

not reach extrinsic evidence unless the term in question is ambiguous, and *Englestein* and *Schek* undermine the existence of any ambiguity. Moreover, even if the Court were to consider the positions taken by the City in the Lumanair litigation, those positions go to the City's understanding of the Lumanair leases decades after their negotiation and execution in 1982 and 1999. The litigation is minimally probative of the City's intent with the respect to JA's lease negotiated and executed decades after the Lumanair leases and nearly ten years before the 2014-2018 Lumanair litigation.

The language in Section 13 differs materially from the case on which JA primarily relies, *Gary Jet*. As here, *Gary Jet* involved an FBO's claim that an Airport Authority breached its lease agreement by violating Grant Assurance No. 22. 2014 WL 1329412, at *2. The court denied dismissal of the breach of contract claim because the lease explicitly provided that the Airport Authority would "operate at the Airport 'consistent with and pursuant to the Sponsor's Assurance.'" *Id.* at *4. But the 2007 lease does not say that the City must act "consistent with" or "pursuant to" the Grant Assurances or the Minimum Standards. It merely states that the lease itself is "subject to" the City's grant agreements with the FAA and "subject and subordinate to" the Minimum Standards. Contract terms matter. The lease was freely negotiated by both sides with the assistance of counsel. The parties could have made the City's obligation to comply with the Minimum Standards and Grant Assurances explicit in the lease, just as the parties did in *Gary Jet*. In view of the "clear and specific"

standard, the differences in the contractual language warrant a different result here.[11]

Section 13 does not indicate a clear and specific intent for the Minimum Standards and Grant Assurances to become obligations under the 2007 lease. On that basis, summary judgment is granted in favor of the City on JA's breach of contract claim.

## Conclusion

For the reasons stated above, the City's motion for summary judgment [169] is granted, and JA's motion for summary judgment [166] is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: November 8, 2024

---

[11] The other two cases on which JA relies did not identify or discuss the operative incorporating language. *Cf. United Airlines, Inc. v. City of Chicago*, 2011 IL App (1st) 102299, ¶ 12; *Lake in the Hills Aviation Grp., Inc. v. Vill. of Lake in the Hills*, 298 Ill. App. 3d 175, 177 (2d Dist. 1998).